**In the Interest of P.S. and L.S.**

**No. 01–87–0167–CV.**

Court of Appeals of Texas,
Houston (1st Dist.).

Feb. 9, 1989.
Rehearing Denied March 1, 1989.

E. Allen Coppock, Houston, for appellant.

Eva Patricia McAnally, Houston, for appellee.

Before EVANS, C.J., and SAM BASS and COHEN, JJ.

## OPINION

EVANS, Chief Justice.

This is an appeal from a judgment in favor of Harris County Children's Protective Services ("CPS"), terminating the parental rights of appellants, Patrick Shearer and wife, Glenda Shearer, with respect to their two minor children. Both parents, and the two children through their attorney ad litem, appeal from the termination decree. We reverse the judgment and remand the cause.

This proceeding was initiated pursuant to Tex.Fam.Code Ann. sec. 15.02 (Vernon Supp.1988). Under this statute, the court may grant a petition seeking termination of the parent-child relationship if it finds that: (1) the parent committed one or more of the acts enumerated in section 15.02(1), and (2) that termination is in the best interest of the child.

This case was submitted to a jury which found: (1) that Mr. Shearer's conduct was an act within subsection (D) of 15.02(1), in that he had knowingly placed or knowingly allowed his children to remain in conditions or surroundings that endangered their physical or emotional well-being; and (2) that the conduct of both parents was an act within subsection (E) of 15.02(1), in that they had engaged in conduct, or knowingly placed the children with persons who engaged in conduct, that endangered the children's physical or emotional well-being. The jury found termination was in the best interest of both children.

In their first and second points of error, appellants challenge the legal and factually sufficiency of the evidence to support the jury's findings. In reviewing the challenge to the legal sufficiency of the evidence, we must consider only the evidence and inferences therefrom that support the jury's findings, and we must disregard all evidence and inferences to the contrary. *Stafford v. Stafford,* 726 S.W.2d 14, 16 (Tex.1987); *see also Richardson v. Green,* 677 S.W.2d 497 (Tex.1984). In reviewing the factual sufficiency challenge, we must consider all the evidence, both for and against the findings. *In re King's Estate,* 150 Tex. 662, 664, 244 S.W.2d 660, 661 (1951). We further recognize that the jury as the trier of fact, is the sole judge of the credibility of the witnesses and of the weight to be accorded their testimony. *See In re M.H.,* 662 S.W.2d 764, 768 (Tex.App. —Corpus Christi 1983, no writ).

Because this is a proceeding for the involuntary termination of the parent-child relationship, the facts must be proved by "clear and convincing evidence." *In re G.M.,* 596 S.W.2d 846, 847 (Tex.1980). This standard of proof does not require the evidence to be unequivocal or undisputed. *State v. Addington,* 588 S.W.2d 569 (Tex. 1979). It does require, however, a greater persuasive force than the preponderance of evidence standard generally used in civil cases. *Brantmeier v. Brazoria Protective*

*Serv. Unit,* 661 S.W.2d 234 (Tex.App.—Houston [1st Dist.] 1983, no writ). Under the "clear and convincing evidence" standard, we must consider whether the evidence presented is sufficient to produce in the mind of the trier of facts a firm belief or conviction as to the truth of the facts alleged. *In re G.M.,* 596 S.W.2d at 847; *In re L.F.,* 617 S.W.2d 335, 336–37 (Tex.Civ. App.—Amarillo 1981, no writ).

There is a difference between the proof required to support a finding based on section 15.02(1)(D), and the showing needed to support a finding based on section 15.-02(1)(E). When a finding is based on subsection (D), evidence regarding a parent's conduct is relevant only to the issue of whether the parent "knowingly" placed or allowed the child to remain in "conditions or surroundings" that endangered his or her physical or emotional well-being. Thus, a finding based on subsection (D) requires proof that the child was placed in or allowed to remain in a dangerous environment. *In re S.H.A.,* 728 S.W.2d 73, 85 (Tex.App.—Dallas 1987, no writ). Different proof is required to support a finding based on subsection (E). There, the focus is on the parent's conduct, not the child's environmental surroundings. In reviewing a subsection (E) finding, we are concerned with whether the parent engaged in conduct or knowingly placed the child with persons who engaged in conduct that endangered the child's physical or emotional well-being. In our review, we look not only at evidence regarding the parent's active conduct, but also evidence showing the parent's omissions or failures to act. *Id.*

The Shearers were married in June 1982, and their first child, P.S., was born less than a year later, on May 2, 1983. In June 1983, when P.S. was about six weeks old, CPS received a report that the child was in danger. A CPS caseworker, Alexandra Russell, made an initial investigation, and found that the report was unfounded. She observed that the child was in good health, and she found nothing that she would consider "shocking" about the child's physical environment at the Shearer's home.

She did testify that Mrs. Shearer told her she needed help "because she couldn't trust herself with her child." Ms. Russell testified she was concerned about Mrs. Shearer's mental state, not only because she doubted her ability to care for the child, but also because Mrs. Shearer reported events that did not appear to be happening.

After visiting the Shearer's home, Ms. Russell contacted Mrs. Shearer's mother and learned that Mrs. Shearer had voluntarily been under the care of a psychiatrist, Dr. Wanda Henao. Ms. Russell then made an appointment with Dr. Henao and accompanied Mrs. Shearer to the appointment.

Dr. Wanda Henao diagnosed Mrs. Shearer as suffering from undifferentiated schizophrenia, characterized by paranoid thinking. She felt that Mrs. Shearer could be stabilized on medication, if she were to take it regularly, but, "even at her best level of functioning, it would require someone looking after her rather than her being able to look after anybody." Dr. Henao testified that Mrs. Shearer was not able to stay on medication without assistance, and that Mr. Shearer had not been able to effectively provide this assistance.

Dr. Henao made specific recommendations for Mrs. Shearer and her child. Because Mrs. Shearer had been hospitalized for psychiatric reasons on five previous occasions, and in view of her failure to take the prescribed medication, Dr. Henao recommended that Mrs. Shearer receive injections of a long-term, long-acting antipsychotic every two weeks. Dr. Henao also recommended that someone other than Mrs. Shearer be made the caretaker of her child, then two months old, until she was better stabilized on medication.

Following this evaluation by Mrs. Shearer's psychiatrist, CPS made the decision to assume custody of P.S., and the child was placed in foster care. At the same time, CPS entered into a parent-agency agreement with Mr. and Mrs. Shearer under which the Shearers agreed, as a prerequisite to the return of the child, to obtain a favorable report from the psychiatrist, to complete the parenting classes, and to continue injection therapy, medication group

therapy, and couples therapy. Four months later, in October 1983, CPS determined that the Shearers had complied with all the terms of the agreement, and the child was returned to the Shearers. Some six months later, in April 1984, CPS dismissed the conservatorship action.

The Shearers' second son, L.S., was born in August 1984. In December 1984, CPS received a complaint that the Shearers' youngest child was in medical danger. Two caseworkers, Tommy Castilow and Veronica Goins, along with two paramedics, were assigned to investigate. Mr. Castilow testified that upon arriving at the Shearers' apartment, he observed the following:

> In the kitchen, there was a sink filled with dishes and water, there was garbage all over the house and every item that could be covered with an ashtray or fast food box or something of this nature was filled with ashes and there were several grocery store bags filled with garbage around the house, there was a half eaten sandwich in the refrigerator and nothing else except a little milk and a little soda.

Mr. Castilow further testified that Mr. Shearer told him that he had not been able to clean the house because of an injury, and he observed a bandage on his hand.

The other caseworker, Veronica Goins, testified that the condition of the apartment was "deplorable because there were clothes scattered here and there, there were toys scattered everywhere. There were dirty diapers and even some clothing that was soiled that was scattered everywhere. Dishes were dirty, and it looked unkept, unclean."

Mrs. Shearer appeared to be in a daze, and she told the caseworkers she had not eaten for two days because her husband would not allow her to eat. She said her husband had hit her and that she was afraid to stay at home. Mrs. Shearer asked the caseworkers to take her and the children to a shelter. Mr. Shearer, although present at the time, made no response to his wife's statements. Based on the physical appearance of the home, and Mrs. Shearer's allegations of abuse, the CPS caseworkers removed the children from the home and placed them in foster care. Mrs. Shearer was taken to Ben Taub Hospital, where she was admitted for a psychiatric evaluation. The following day, CPS filed this termination action.

About five days after the children were removed from the Shearers' home, the Shearers appeared at the CPS offices to talk about having the children returned to them. As the caseworker discussed the objectionable conditions of the home, Mrs. Shearer was unresponsive and unable to communicate. Mr. Shearer attributed the condition of the home to the fact that he had injured his hand in a work-related accident and had been unable to do the housework. He told the caseworker that his wife had not taken the medication prescribed by Dr. Henao, but that she was currently taking the medication prescribed for her at Ben Taub Hospital.

Following a court hearing on December 20, 1984, CPS was awarded temporary conservatorship of the children. Thereafter, the Shearers made regular visits with the children. Initially, Mrs. Shearer kept wandering off during the visits, but after about a month, she appeared to be in better control and was able to speak and interact with her children. This change was attributed to the medication being prescribed for her during her hospitalization at Ben Taub.

In January 1985, the Shearers' case was transferred to yet another CPS caseworker, Ruth Ducette, who continued to handle the case until May 1987, shortly before the trial of this case. Ms. Ducette testified that the Shearers had moved into a new apartment after their children were removed from their custody, and that the new apartment was neat and tidy. It consisted of two large bedrooms, one bathroom, a kitchen, and a dining area. Although Mrs. Ducette found the apartment "messy" on two of her visits, she felt the apartment was an appropriate home for the children.

On February 26, 1985, CPS and the Shearers signed a second parent-agency agreement. As a condition to the physical

return of the children, the Shearers agreed that Mrs. Shearer would remain on her prescribed medication; that they would keep their home in a healthy and safe condition for the children; that they would attend counseling; and that they would cooperate with the court-appointed special child advocates.

During the spring of 1985, the Shearers visited regularly with the children, and there was a notable improvement in the condition of the Shearers' home. But CPS also received reports that Mrs. Shearer was not keeping her psychiatric appointments and that she was not taking her prescribed medicine.

In July 1985, the Shearers' caseworker and her supervisor met with the Shearers, their attorney, the court-appointed special advocate, and two doctors from Houston Child Guidance to discuss the conditions for returning the children to their home. At that meeting, Mr. Shearer confirmed that Mrs. Shearer had not been taking her medication and had not been keeping her appointments with her psychiatrist. He indicated that Mrs. Shearer had discontinued her medication because she was pregnant and concerned about the effect of the medication on her unborn child.

In September 1985, Mrs. Shearer delivered a stillborn baby, and in June 1986, she suffered a miscarriage.

In early 1987, CPS and the Shearers met in court and agreed on a new set of conditions. Mr. Shearer agreed that he would change his work hours so that he could be at home when the children were there, and that he would make arrangements for therapeutic day care for the children. An ESCAPE volunteer, a CASA volunteer, and a home management worker were appointed to assist the family in effectuating these plans.

Mr. Shearer did change his schedule, which required him to be at work at 7 a.m. and to work weekends; but even under his new schedule, it was impossible for him to be at home at all times when the children were there. Moreover, the day care center that he had selected was not open on weekends and could not receive the children on

weekdays before 7 a.m. Mr. Shearer proposed that his wife deliver the children in the mornings, but CPS considered this solution to be unacceptable. Evidently, there were no follow-up arrangements regarding day care of the children.

In February 1987, weekly preplacement home visits were initiated by CPS. Under this plan, the children were allowed to stay with the Shearers during the two days when Mr. Shearer was off work. Everything went well on the first visit, but on the second visit, in March 1987, Mr. Shearer was not home, and Mrs. Shearer asked the caseworker not to leave the children alone with her. The caseworker was required to wait until Mr. Shearer returned home before leaving the children there.

Home visits in April went well, but in May, Mrs. Shearer asked the caseworker and the CASA volunteer to take the children from the home, saying that she could not handle them. She stated that she did not know how to take care of children or how to feed them.

As a result, Ms. Ducette, the CPS caseworker assigned to the Shearers' case, became convinced that Mrs. Shearer would never be able to take care of the children. She was also concerned because P.S.'s school had reported he had regressed after the in-home visits. Ms. Ducette notified the court of her conclusion and of her reasons for the discontinuance of the preplacement visits. This termination action was then initiated.

■ After reviewing the evidence relating to the jury's finding on subsection (D) of section 15.02(1), we conclude there is legally insufficient evidence to support the jury's finding that Mr. Shearer knowingly placed or knowingly allowed his children to remain in conditions or surroundings that endangered their physical or emotional well-being. As stated above, there was testimony that the Shearers' apartment was "deplorable ... dirty diapers and even some clothing that was soiled ... scattered everywhere. Dishes were dirty, and it looked unkept, unclean." One CASA volunteer, Janet Moore, testified that the con-

dition of the Shearers' apartment never varied, describing it as "shabby and not well kept, and just has an air of neglect." Another CASA volunteer, Carol Bailey, testified that she felt the Shearer's home lacked "an active and stimulating environment" for the children, and that the children never went outside while the mother was home. The evidence is undisputed that Mr. Shearer was aware of these shortcomings, which had been pointed out to him during his meetings with CPS representatives. This evidence, even considered without regard to any other evidence in the case, does not meet the standard of proof needed to support a termination decree. Therefore, we hold that the evidence is legally insufficient to support the jury's affirmative finding that Mr. Shearer knowingly placed or knowingly allowed his children to remain in conditions or surroundings that endangered their physical or emotional well being.

We do find however, that CPS did produce evidence that is legally sufficient to support the jury's finding that the conduct of both parents constituted unacceptable conduct within the meaning of section 15.02(1)(E). There was testimony from several witnesses that Mrs. Shearer demonstrated an air of irresponsibility toward her children. Mrs. Shearer told one caseworker, Ms. Russell, that she was uncomfortable about caring for her baby, that she had been feeling suicidal, and had told her husband that she might drown herself and the baby. Mrs. Shearer said she did not feel she could be responsible for caring for the child because of the way she was feeling.

There was also extensive medical testimony concerning Mrs. Shearer's instability. Mrs. Shearer's psychiatrist, Dr. Henao, testified that Mrs. Shearer's psychosis "overrides everything else," and that at best, she had only borderline intelligence. Dr. Henao indicated her belief that Mrs. Shearer would never be able to care for her children. "She could visit them for an hour or so, play with them a little bit, but no caretaking function." She said that the patient's history speaks for itself, and that the children were definitely at risk if they remained with the mother. She testified that Mrs. Shearer's condition posed an emotional and/or physical threat to the children, and that she had known of other children who had been injured by psychotic mothers.

Another medical witness, Dr. Jack Fletcher, diagnosed Mrs. Shearer as having schizophrenia, undifferentiated type, and organic brain syndrome. Dr. Fletcher, an associate professor of psychology at the University of Houston and a clinical neuropsychologist, said that Mrs. Shearer had a severe mental illness and was a seriously disturbed individual. He said he felt Mrs. Shearer could be a danger to herself, that her prognosis was very poor, and that without treatment, she would deteriorate into more serious psychosis. He said she would not be able to cope with the stress of a child who was very demanding, and would not have the functional capacity to care for a child.

Dr. Arnold Berlin, who practices internal medicine, was on duty at MacGregor Clinic when he was called the night before trial by Mr. Shearer regarding Mrs. Shearer's unwillingness to testify at trial. At Mr. Shearer's request, Dr. Berlin examined Mrs. Shearer at that time. Dr. Berlin testified that Mrs. Shearer exhibited paranoia, confusion, disorientation, and schizophrenia, and that she was out of touch with reality. He stated that, based on those symptoms, he would not entrust the care of small children to her by herself.

Dr. Patrick Brady, Chief Psychologist at Houston Guidance Center, examined Mrs. Shearer after CPS received the second complaint concerning the children. Based on Mrs. Shearer's file, his interview with both Shearers, and his discussion with Dr. Henao's associate, Dr. Alan Hurwitz, Dr. Brady concluded that Mrs. Shearer had a history of recurring episodes of psychosis, and that her illness was the type that would come and go and eventually progress. He said that if her illness were left untreated, she could pose a danger to her family, and that instead of using common sense, she might see things in a distorted way.

Considering only the evidence that tends to support the jury's finding, the jury could reasonably have decided that Mrs. Shearer's conduct endangered her children's physical or emotional well-being when she did not maintain her prescribed medication, and that there was no reasonable probability that Mrs. Shearer would take her medication on a regular basis. There was also testimony from which the jury could reasonably have found that Mr. Shearer was fully aware of the danger posed by his wife's condition, and that whenever the matter was brought to his attention, he either acted negatively or chose to ignore the problem. There was testimony that he "just kinda coasted along with everything," and that he resented the CPS involvement, feeling that there was "no need" for such involvement. Mr. Shearer had an "unreasonable attitude about his wife's illness," expecting "more of her than she is able to deliver." He seemed to be functioning at a "low level," being unable to understand his wife's need for medication and for regular visits to the doctor. He did not appreciate "the extent and seriousness of his wife's illness," or that she could not care for their children alone.

Considering only the evidence in support of the jury's finding, we conclude that the jury could reasonably have found that the Shearers' conduct demonstrated a basic lack of care and attention toward the children, and that this lack would probably continue to be demonstrated in future conduct. Thus, the jury could have decided that Mrs. Shearer's mental instability would continue and progress, that she would not keep her appointments for psychiatric counseling nor take her prescribed medication, and that Mr. Shearer would continue to be indifferent about whether Mrs. Shearer's instability was having an emotional or physical impact on their children. *See Brantmeier*, 661 S.W.2d at 236; *see also In re E.S.M.*, 550 S.W.2d 749, 757 (Tex.Civ.App.—Houston [1st Dist.] 1977, writ ref'd n.r.e.); *D.F. v. State*, 525 S.W.2d 933, 940 (Tex.Civ.App.—Houston [1st Dist.] 1975, writ ref'd n.r.e.).

Although we have concluded that there is some evidence of sufficient probative force to support the grounds for termination, we further conclude, on balance, that the evidence is not so clear and convincing as to meet the factual sufficiency challenge. *See Hellman v. Kincy, Jr.*, 632 S.W.2d 216, 219 (Tex.App.—Fort Worth 1982, no writ); *In re R.L.*, 620 S.W.2d 249 (Tex.Civ.App.—Amarillo 1981, no writ). Having viewed all of the evidence in the record, both for and against the jury's findings, we conclude that evidence could not produce a firm belief or conviction in the mind of the trier of facts that the challenged facts are true.

We initially note that CPS failed to establish by clear and convincing evidence that the children had ever been harmed by Mrs. Shearer's condition or while in her care. Although there was some testimony, particularly that of the medical experts, suggesting that Mrs. Shearer might have a psychotic episode while the children were entrusted to her care, there is no showing that such circumstances ever occurred. Also, there was some testimony suggesting that both children were "developmentally delayed," but the cause of such detrimental development was not firmly attributed to any act or omission on the part of the Shearers.

On the other side of the ledger, there was evidence that both Mr. and Mrs. Shearer were cooperative with CPS and the other child care workers, and both parents continuously demonstrated feelings of love and affection toward their children, which feelings the children returned. There was evidence indicating that when Mrs. Shearer took her medication regularly, her general condition, and that of her children, showed substantial improvement. There was testimony suggesting that the Shearers believed the side effects of Mrs. Shearer's medication posed a serious threat to her unborn child, and testimony that there were, in fact, medical risks inherent in taking such medication.

When we consider the evidence in its entirety, we find two parents of not exceptional intelligence who, under severe limita-

tions, have been struggling to provide for their children as best they could. The Shearers voluntarily sought the care of a psychiatrist for Mrs. Shearer's mental illness, and after CPS interceded, both parents voluntarily participated in numerous self-help groups in an attempt to regain custody of their children.

All parties are in agreement that Mr. Shearer is a loving father, and that he has a good relationship with his sons. He works full-time, both at his job and at home, and the children are attached to him. He has shown an ongoing desire to keep his family together, often a most difficult task in view of his wife's mental condition. He arranged his schedule to be at home when the children were at home, and he tried to meet all suggested alternatives for their care when he was absent. He and his wife made regular visits to the children when they were in CPS custody, and all the evidence, considered in its entirety, tends to show a father who loves his wife and his children and who places his family first in his life.

We fully recognize the difficulties faced by the CPS representatives in their ongoing dealings with the Shearers, and we commend their continuous efforts to assist the Shearers in finding alternative solutions. But the natural right that exists between parents and their children is one of constitutional dimensions. *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed. 2d 15 (1972). Actions that break the ties between a parent and child can never be justified without the most solid and substantial reasons. *State v. Deaton,* 93 Tex. 243, 54 S.W. 901 (1900).

In contrast to a suit for conservatorship, possession, and support, a suit seeking termination of parental rights requires strict scrutiny because it "divests for all time the parent and child of all legal rights, privileges, duties, and powers with respect to each other. The difference in the proceedings justifies the caution with which the courts have characteristically considered termination cases." *Wiley v. Spratlan,* 543 S.W.2d 349, 352 (Tex.1976).

Although the evidence established that the Shearers failed to meet the *level of conduct* specified in the parent-agency agreement, which would have entitled them, under the terms of the agreement, to regain custody of their children, that failure does not, in itself, provide justification for terminating their parental rights.

The great weight and preponderance of the evidence shows that the Shearers' failure to provide a desirable degree of care and support for their children was due largely to Mrs. Shearer's mental instability, and to both parents' lack of intelligence, training, and economic status. Under the record considered in its entirety, we conclude that there is not that "solid and substantial" evidence to support the jury's findings under either subsection (D) or subsection (E). *See Hellman,* 632 S.W.2d at 219; *In re R.E.W.,* 545 S.W.2d 573 (Tex. Civ.App.—Houston [1st Dist.] 1976, writ ref'd n.r.e.); *D.F. v. State,* 525 S.W.2d at 940. Whether or not the Shearers are entitled to regain custody of their children is an issue not before us. *See* Tex.Fam.Code Ann. sec. 15.05(c)(2) (Vernon Supp.1988).

We sustain the factual sufficiency challenges contained in the first two points of error. In view of this disposition, we consider it unnecessary to discuss the remaining points of error.

The judgment of the trial court is reversed, and the cause is remanded for further proceedings consistent with this opinion.