TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN







NO. 03-99-00432-CV







Charles Mincy, Appellant


v.



Texas Department of Protective and Regulatory Services, Appellee








FROM THE DISTRICT COURT OF TRAVIS COUNTY, 126TH JUDICIAL DISTRICT


NO. 98-05186, HONORABLE SUZANNE COVINGTON, JUDGE PRESIDING







 Charles Mincy appeals a jury verdict terminating his parental rights to a daughter,
C.M. The trial court rendered judgment pursuant to the jury's verdict and appointed the Texas
Department of Protective and Regulatory Services (the "Department") as permanent managing
conservator. In eight issues, appellant challenges the jury findings as legally and factually
insufficient. We affirm.


FACTUAL BACKGROUND

 In 1993, Mincy met Derloris Clay ("Clay") when he was eighteen and she was
pregnant with C.C., her first child. Thereafter, Mincy and Clay lived together. In 1994, Clay
learned that she was pregnant with C.M. During the pregnancy, Mincy served six months in a
local jail but was released in time to be present for his daughter's birth in September.

 Within a month after C.M. was born, Mincy was arrested on four counts of
attempted murder. During Mincy's criminal trial for attempted murder, Clay was arrested and
jailed for disorderly conduct. A Travis County deputy sheriff observed Clay "dragging" a child
out of the courtroom and into a nearby bathroom. The deputy encountered Clay with C.C. in the
courthouse bathroom during an investigation of loud yelling, a child's screams, and the sound of
spanking. A deputy sheriff arrested Clay for disorderly conduct and delivered the child to
Mincy's mother, Linda Askew, who was in the courtroom.

 Mincy was acquitted on the murder charges. He pleaded guilty to attempted
aggravated assault and was sentenced to one year in jail for which he served six months. He was
released in April 1995.

 In May 1995, Mincy and Clay were both arrested for assault arising out of a
domestic dispute. Mincy entered a plea of nolo contendere and was sentenced to 120 days in jail. 
In June 1995, Mincy was charged with aggravated robbery with a deadly weapon. He pleaded
guilty and was sentenced to ten years in prison.

 In September 1995 and April 1996, the Department received its first two referrals
alleging that Clay was neglecting and physically abusing C.M. and C.C. At the time of the
referrals, Mincy was incarcerated. The Department was unable to substantiate the allegations and
the children remained with Clay. After two additional referrals alleging physical abuse by Clay
in October 1996 and a third referral in March 1997, the two children and a one-month-old baby,
K.C., were removed from Clay's custody. The children were reunited with Clay in October 1997
pursuant to a service plan (1) providing for Clay to receive psychiatric services. After two more
referrals in April and May 1998, the three children were removed again. The State placed C.M.
with Askew. The Department filed a petition to terminate Clay's parental rights as well as those
of Mincy. (2)

 In August 1998, Clay was arrested on criminal charges of injury to a child. During
the termination trial in February 1999, Clay was incarcerated on charges of injury to a child, theft
of a car stereo, and criminal trespass at her daughters' school. Mincy was incarcerated on the
conviction for aggravated robbery, a sentence he continues to serve. 

 The case was tried to a jury, which returned a verdict in favor of termination. The
trial court rendered a decree terminating Mincy's parental rights. At the time of trial, C.M. was
four years old. From her birth through this appeal, Mincy has been incarcerated for all but three
months of his daughter's life. He is due for a first parole hearing in 2001 and will be released
in 2005 if required to serve his full sentence.

DISCUSSION

 A court may terminate a parent-child relationship if it finds that (1) the parent has
engaged in any of the specific conduct enumerated in the Family Code as grounds for termination,
and (2) termination is in the child's best interest. See Tex. Fam. Code Ann. § 161.001 (West
Supp. 2000); Texas Dep't of Human Servs. v. Boyd, 727 S.W.2d 531, 533 (Tex. 1987). Here,
the Department asserted the following three Code provisions to support the involuntary
termination of Mincy's parental rights: (1) Mincy knowingly placed or knowingly allowed C.M.
to remain in conditions or surroundings which endangered her physical or emotional well-being;
(2) Mincy engaged in conduct or knowingly placed C.M. with persons who engaged in conduct
which endangered her physical or emotional well-being; and (3) Mincy constructively abandoned
C.M. after the child had been placed in the permanent or managing conservatorship of the
Department for not less than six months. See Tex. Fam. Code. Ann. §§ 161.001(1)(D), (E), (N). 
In addition, the Department urged that termination would be in the best interest of the child. See
id. § 161.001(2).


Standard of Review

 When reviewing the sufficiency of the evidence, we first examine the legal
sufficiency of the evidence. See Segovia v. Texas Dep't of Protective & Regulatory Servs., 979
S.W.2d 785, 787 (Tex. App.--Houston [14th Dist.] 1998, pet. denied). In reviewing the legal
sufficiency of the evidence, we consider only the evidence and inferences tending to support the
verdict and disregard all evidence and inferences to the contrary. See id. 

 Because the termination of a parent-child relationship implicates fundamental
constitutional rights, see Spurlock v. Texas Dep't of Protective & Regulatory Servs., 904 S.W.2d
152, 158 (Tex. App.--Austin 1995, writ denied) (citing Stanley v. Illinois, 405 U.S. 645, 651
(1972)), the State has the burden of proving the necessary elements for termination by "clear and
convincing evidence." Tex. Fam. Code Ann. § 161.001; see In re G.M., 596 S.W.2d 846, 847
(Tex. 1980). Under the "clear and convincing evidence" standard, we must consider whether the
evidence presented is sufficient to produce in the mind of the trier of fact a firm belief or
conviction as to the truth of the facts alleged. See G.M., 596 S.W.2d at 847. Mincy does not
contend that the clear and convincing standard of proof warrants a higher standard of review on
appeal. See Spurlock, 904 S.W.2d at 155-56; D.O. v. Texas Dep't of Human Servs., 851 S.W.2d
351, 353 (Tex. App.--Austin 1993, no writ). But see, e.g., Edwards v. Texas Dep't of Protective
& Regulatory Servs., 946 S.W.2d 130, 136 (Tex. App.-- El Paso 1997, no writ).

 Because multiple grounds for termination were alleged by the Department, the
jury's verdict will be upheld if the evidence is legally and factually sufficient to support any of
the grounds for termination and that the termination is in the best interest of the child. See
Edwards, 946 S.W.2d at 135; In re D.L.N., 958 S.W.2d 934, 937 (Tex. App.--Waco 1997, no
pet.); see also Texas Dep't of Human Servs. v. E.B., 802 S.W.2d 647, 649 (Tex. 1990). 


Conduct Sufficient to Justify Termination

 Mincy agrees that the evidence is sufficient to support the jury's decision as to
Clay, but he urges that it is insufficient to warrant termination of his parental rights. He contends
that there is no evidence or insufficient evidence that he (i) knowingly placed or allowed the child
to remain in conditions which endangered her physical or emotional well-being, (ii) engaged in
conduct or knowingly placed the child with persons who engaged in conduct which endangered
the physical or emotional well-being of the child, or (iii) abandoned the child after she had been
in the custody of the Department for not less than six months. We disagree.

 In his first four issues, Mincy challenges the legal and factual sufficiency of the
evidence to support the finding that he knowingly placed or knowingly allowed C.M. to remain
in conditions or surroundings which endangered her physical or emotional well-being, or engaged
in conduct or knowingly placed the child with persons who knowingly engaged in conduct
dangerous to the child's well-being, as described in section 161.001(1)(D) and (E) of the Family
Code. See Boyd, 727 S.W.2d at 534. To support a finding under either subsection (D) or (E) of
section 161.001(1), the evidence must show the parent engaged in conduct which "endangered"
the child's physical or emotional well-being. Under subsection (D), the environment, as opposed
to the parent's conduct, must be the source of endangerment to the child. Under subsection (E),
the cause of the endangerment to the child must be the parent's conduct alone, including the
parent's actions or omissions. Both subsections require knowledge by the parent. See Tex. Fam.
Code Ann. § 161.001 (D), (E). It is not necessary that the conduct of the parent be directed at
the child or that the child actually suffer injury. See In re M.C., 917 S.W.2d 268, 269 (Tex.
1996). The danger to the child may be inferred from the parental misconduct. See Boyd, 727
S.W.2d at 533; In re B.R., 950 S.W.2d 113, 119 (Tex. App.--El Paso 1997, no pet.). 

 Mincy argues that his incarceration alone is legally insufficient to support the jury's
verdict that he engaged in conduct that endangered C.M. or that he allowed her to remain in
conditions that endangered her well-being. He argues that, because he was incarcerated and
unaware of Clay's abusive conduct toward the children, he did not engage in any conduct, nor did
he knowingly allow C.M. to remain in conditions, which endangered her well-being.

 The evidence showed that C.M. was born on September 23, 1994. Mincy was
arrested in October 1994 and remained incarcerated until April 1995. He was again arrested in
June 1995 on a new charge and was imprisoned from that date through trial. The first referral
to the Department occurred in September 1995--after Mincy's incarceration for the sentence he is
now serving.

 Imprisonment alone does not constitute conduct sufficient to satisfy section
161.001(1) of the code. See Boyd, 727 S.W.2d at 533 (referencing a previous version of the Code
provision); Trevino v. Texas Dep't of Protective and Regulatory Servs., 893 S.W.2d 243, 247
(Tex. App.--Austin 1995, no writ). However, when the evidence, including imprisonment,
displays a "course of conduct that has the effect of endangering the physical or emotional well-being of the child, a finding under [§ 161.001(1)(E)] is supportable." Harris v. Herbers, 838
S.W.2d 938, 942 (Tex. App.--Houston [1st Dist.] 1992, no writ). Moreover, if the imprisonment
evidences a "voluntary, deliberate and conscious course of conduct, it qualifies as conduct that
endangers the emotional well-being of the child." Id. Clearly, in this case, Mincy's incarceration
is a factor that the jury could properly consider in reaching its verdict. The jury was entitled as
well to consider the nature of the offense for which Mincy is incarcerated and the facts of the
offenses for which he was convicted following the birth of his daughter.

 The evidence at trial established that Mincy engaged in a pattern of criminal activity
immediately before and after the birth of C.M. and that his actions involved violence to other
persons. The pattern consisted of an unspecified offense for which Mincy served six months
while Clay was pregnant with C.M., three counts of attempted aggravated assault, Class A
assault, and aggravated robbery with a deadly weapon. 

 The aggravated assault conviction stemmed from attempted murder charges for
which Mincy was arrested approximately one month after C.M.'s birth. Mincy testified that he
was returning home from a friend's home when he encountered a group of individuals he knew,
possibly drug dealers, hanging out on a street corner. After exchanging "words," Mincy fired
a .38 caliber pistol into the group, injuring four individuals. He was arrested for attempted
murder. At trial, Mincy testified that he often carried a weapon because he lived in a dangerous
neighborhood. Mincy was acquitted but pleaded guilty to a third-degree felony of attempted
aggravated assault with a deadly weapon. 

 One month after he was released from jail for the assault charge, Mincy committed
an assault during a domestic dispute involving Clay and her cousin. While the facts of the
incident were disputed, both Mincy and Clay were arrested. Mincy was convicted of assault and
served 120 days in jail. 

 In June 1995, Mincy was arrested for aggravated robbery with a deadly weapon,
the offense for which he was incarcerated at the time of the termination trial. He admitted his
participation in a robbery in which one of his two codefendants shot a robbery victim with a
shotgun. Mincy testified that he was unarmed and that his role was confined to "digging in [the
victims'] pockets while everybody else holds the gun." For this offense, Mincy received a ten-year sentence. Barbara Johnson, Clay's aunt and neighbor, testified that during this same time
period both Mincy and Clay were selling drugs. Clay sold drugs in the home.

 We are thus presented with a series of criminal acts in a short time frame. From
October 1994 through June 1995, Mincy was arrested for three crimes of violence. Each of these
offenses was an intentional act; two involved a deadly weapon. Mincy committed the acts with
the knowledge that he might be imprisoned and thus be unable to provide or care for his family. 
As one court explained:


It was appellant's voluntary acts which brought about his confinement in the
penitentiary. There is no hint in our record that anyone other than appellant was
in any degree responsible for appellant's inability to visit with his child or to
contribute to her support. Only his course of criminal conduct has prevented his
exercising parental authority or making any parental contribution to the child.



Hutson v. Haggard, 475 S.W.2d 330, 333 (Tex. Civ. App.--Beaumont 1971, no writ); see also
Allred v. Harris County Child Welfare Unit, 615 S.W.2d 803, 807 (Tex. Civ. App.--Houston [1st
Dist.] 1980, writ ref'd n.r.e.) ("Wilful criminal activity with knowledge of a pregnancy and of
the consequences of the course of conduct implie[s] 'conscious disregard and indifference' to
parental responsibilities."). If the imprisonment of the parent displays a voluntary, deliberate,
and conscious course of conduct, a jury may find that it qualifies as conduct that endangers the
emotional well-being of the child. See In re W.A.B., 979 S.W.2d 804, 807 (Tex. App.--Houston
[14th Dist.] 1998, pet. denied). 

 Viewing this evidence in the light most favorable to the verdict, we conclude the
jury could have properly concluded Mincy knowingly allowed C.M. to remain in conditions which
endangered her well-being or that he engaged in a course of conduct which endangered her. We
hold the evidence is legally sufficient to support the termination of Mincy's parental rights. 

 We now consider all the evidence presented at trial to evaluate its factual
sufficiency. The Department presented twenty witnesses, including Department investigators, the
children's therapists and psychologists, two of Clay's aunts, a detective with the Austin Police
Department, Child Protective Services investigators and workers, an emergency room physician,
the manager of Clay's apartment complex, Clay's counselor, a family practice resident, the
children's foster parent, Clay, and Mincy. Most of the witnesses testified concerning their
observations of Clay's abusive behavior and her abuse of the children. The overwhelming
evidence at trial established that C.M. was subjected to severe physical and emotional abuse from
Clay and that C.M. observed similar abuse of her sisters. In addition to the testimony of her aunt
that she sold drugs, Clay tested positive for marihuana use.

 Dr. Steve Crow, a family physician at Blackstock Family Health Center, treated
C.M. in 1995. He assisted in making a referral to the Department because of his concerns that
the children were suffering emotional and possibly physical abuse from their mother. Lucia Cao,
an investigator for Child Protective Services, testified that she investigated a referral to the
Department in March 1997. C.M. had a swollen, reddish bump and an abrasion on her left eye
and marks and discoloration on her legs. C.C. told Cao that Clay had "popped" C.M. on the
head with a spoon. Clay explained to Cao that she hit C.M. because she would not eat her food
or listen to Clay. C.M., who was holding a spoon in her hand, held her hands in front of her
head. When C.M. attempted to block the blow, Clay hit her face with the spoon, causing the
injury to the eye area. On another occasion, Clay struck C.M. on the face and body with a belt
because she was not eating fast enough. The evidence at trial established that Clay repeatedly hit
her children with her hand and other objects and used vulgar language and profanity, calling them
"bitches" and "whores." C.M.'s foster mother (3) testified that in 1997 when C.M. was placed in
her care, C.M., who was then two years old, exhibited aggressive behavior toward her foster
parents and children at her day-care center. She screamed and yelled profanities at her foster
parents, calling them "bitches" and "assholes." Of the thirty-six children who had been placed
in her care, the foster mother testified that C.M. and C.C. were the most severely disturbed. 
C.M. also displayed inappropriate sexual behavior. The foster mother further testified that C.M.
never spoke of her father and that C.M. received no calls or letters from Mincy.

 Mincy contends that, because the referrals occurred after he was incarcerated, he
was unaware of Clay's abusive behavior and thus there is no proof that he knowingly allowed
C.M. to remain in danger. Mincy lived with Clay for short periods of time early in C.M.'s life. 
No evidence was adduced to show that Mincy observed the abuse or the drug use. There was,
for example, no evidence presented that showed Mincy was aware of the events in the courthouse
bathroom that led to Clay's arrest for disorderly conduct. 

 Mincy testified that Clay brought C.M. to visit him on a weekly basis at a local jail
until he was transported to prison in August 1996. From August 1996 through the time of trial,
Mincy saw C.M. on only two occasions. Mincy testified that while in prison he communicated
frequently with his daughter through letters to his mother, Linda Askew, who had temporary
custody of C.M. Although three letters were admitted in evidence, Mincy testified that most of
the letters were lost when his mother's house was flooded.

 Despite Clay's continuous abuse and unstable conduct through the years, Mincy
testified that she was "a good mother," that she never raised her voice or hit the children, and that
he never observed any problems. He did not dispute the extensive evidence of Clay's abuse. In
light of the nature and extent of Clay's abuse of the children over a long period of time, a jury
could reasonably conclude that Mincy was not credible as to his lack of knowledge. The jury is
free to judge the weight and credibility of each witness's testimony. See In re P.S., 766 S.W.2d
833, 834 (Tex. App.--Houston [1st Dist.] 1989, no writ).

 Before his arrests, Mincy worked for JT Body Shop and for his mother at the
Convention Center. Because Mincy has been incarcerated, however, he has been unable to
contribute any money to his child's support. To his credit, in prison Mincy is learning to be a
cook and is working to obtain his GED. There is evidence that he is trying to change his life.

 While there was no evidence that Clay physically abused C.M. or the other children
in Mincy's presence, testimony showed that Mincy and Clay were dealing drugs. Based on this
testimony, the jury could have rationally concluded that both Mincy and Clay exposed the children
to the dangers inherent in the drug trade, including the risks of violence and imprisonment. Given
that Mincy testified he often carried a gun and was involved in a confrontation with drug dealers
and an altercation with Clay, a jury could rationally conclude that Mincy had knowledge the
children were exposed to a dangerous environment. Mincy's inability to provide a stable home
for C.M. together with his consistent inability to avoid criminal activity implies a conscious
disregard for his parental responsibilities.

 We hold that the evidence is factually sufficient to support the termination of the
parent-child relationship because the jury could reasonably have concluded that Mincy knowingly
allowed C.M. to remain in conditions which endangered her well-being and engaged in a course
of conduct which endangered her well-being. We overrule Mincy's first through fourth issues.

 Because we have determined that sufficient evidence supports two of the statutory
bases the jury found for termination--that Mincy engaged in conduct that endangered the physical
or emotional well-being of C.M. and that he allowed her to remain in conditions that endangered
her well-being, either of which would support the judgment--we decline to address Mincy's fifth
and sixth issues on appeal. 


Best Interest of the Child

 In his seventh and eighth issues, Mincy contends that there is insufficient legal and
factual evidence that termination of his parental rights was in the best interest of C.M. We
conclude that there is ample evidence from which a jury could conclude that termination is in the
child's best interest. (4)

 Due to C.M.'s young age, little evidence was presented of the child's desires
concerning termination. The psychologist who examined C.M. diagnosed her with adjustment
disorder with a high risk for ongoing mental health problems. He concluded that she had never
bonded with her mother and that "not much" bonding could occur with an absent parent whose
only contact with the child was for three months during her infancy and through letters from
prison. He concluded that C.M. would be able to adjust to a long-term foster home and would
benefit from permanent placement. The psychologist also observed that C.M. was relieved to be
in the foster home, which he found unusual in such a young child.

 Department case workers testified that Mincy's parental rights should be terminated
because of his lack of interest and because "he's built a career in the corrections system." 
Further, investigators for the Department concluded that C.M. did not know Mincy "as a father." 
They testified that C.M. is in need of a permanent home and that termination is in the child's best
interest.

 Mincy presented testimony of his future plans to work as a cook and support C.M.
after his release from prison. Although Mincy is eligible for parole this year, if he is required
to complete his sentence, he will not get out of prison until C.M. is ten or eleven years old. 
Although the Department initially named Mincy's mother as its preferred choice for C.M.'s
adoptive parent, that home is no longer suitable for placement. If Mincy's parental rights are not
terminated, the Department may have to serve as C.M.'s conservator for several years, depending
on whether Mincy receives parole.

 We conclude that there is legally sufficient evidence to support the jury's finding
concerning the best interest of the child and that the jury's verdict is not so contrary to the
overwhelming weight of the evidence as to be clearly wrong and unjust. We overrule Mincy's
seventh and eighth issues. 

 We affirm the district court's judgment.



 

 Jan P. Patterson, Justice

Before Justices Jones, Yeakel and Patterson

Affirmed

Filed: May 18, 2000

Do Not Publish

1. A Family Service Plan is prepared by the Department and the family. The plan sets
goals for the parents to reach in order for the children to be returned home to a safe and stable
environment.
2. The Department's petition also sought the termination of Clay's parental rights to the
other two children, C.C. and K.C., as well as the parental rights of their natural fathers, Kenneth
Rich and Charles Bryant. Charles Bryant, C.C.'s natural father, failed to appear for trial and his
rights were terminated. Kenneth Rich, K.C.'s natural father, submitted a sworn affidavit
relinquishing his parental rights to K.C. The trial court entered an order terminating the parental
rights of Clay, Rich, and Bryant; they are not parties to this appeal. Because only Mincy has
appealed the termination order, we will refer to facts relating to Clay only to the extent they are
relevant to Mincy.
3. C.M. was in foster care with the same foster parent on two occasions, spanning several
months each time. She was first placed in foster care in May 1997; she was reunited with her
mother in October 1997. She was removed again in May 1998 and eventually was sent to live
with Askew. 
4. When determining the best interest of the child, we consider the non-exhaustive list of
factors set forth in Holley v. Adams, 544 S.W.2d 367, 371-72 (Tex. 1976).


G>

 In his seventh and eighth issues, Mincy contends that there is insufficient legal and
factual evidence that termination of his parental rights was in the best interest of C.M. We
conclude that there is ample evidence from which a jury could conclude that termination is in the
child's best interest. (4)

 Due to C.M.'s young age, little evidence was presented of the child's desires
concerning termination. The psychologist who examined C.M. diagnosed her with adjustment
disorder with a high risk for ongoing mental health problems. He concluded that she had never
bonded with her mother and that "not much" bonding could occur with an absent parent whose
only contact with the child was for three months during her infancy and through letters from
prison. He concluded that C.M. would be able to adjust to a long-term foster home and would
benefit from permanent placement. The psychologist also observed that C.M. was relieved to be
in the foster home, which he found unusual in such a young child.

 Department case workers testified that Mincy's parental rights should be terminated
because of his lack of interest and because "he's built a career in the corrections system." 
Further, investigators for the Department concluded that C.M. did not know Mincy "as a father." 
They testified that C.M. is in need of a permanent home and that termination is in the child's best
interest.

 Mincy presented testimony of his future plans to work as a cook and support C.M.
after his release from prison. Although Mincy is eligible for parole this year, if he is required
to complete his sentence, he will not get out of prison until C.M. is ten or eleven years old. 
Although the Department initially named Mincy's mother as its preferred choice for C.M.'s
adoptive parent, that home is no longer suitable for placement. If Mincy's parental rights are not
terminated, the Department may have to serve as C.M.'s conservator for several years, depending
on whether Mincy receives parole.

 We conclude that there is legally sufficient evidence to support the jury's finding
concerning the best interest of the child and that the jury's verdict is not so contrary to the
overwhelming weight of the evidence as to be clearly wrong and unjust. We overrule Mincy's
seventh and eighth issues. 

 We affirm the district court's judgment.



 

 Jan P. Patterson, Justice

Before Justices Jones, Yeakel and Patterson