

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-12-00323-CV

**IN THE INTEREST OF S.K.V.** and T.A.V., Children

From the 285th Judicial District Court, Bexar County, Texas
Trial Court No. 2010-PA-01592
Honorable Peter Sakai, Judge Presiding

Opinion by:      Sandee Bryan Marion, Justice

Sitting:         Karen Angelini, Justice
                 Sandee Bryan Marion, Justice
                 Marialyn Barnard, Justice

Delivered and Filed:  January 2, 2013

AFFIRMED

This is an appeal from the trial court's termination of appellant's[1] parental rights to his two children. *See* TEX. FAM. CODE ANN. § 161.001(1)(D), (E), and (2) (West Supp. 2012). We affirm.

### SUFFICIENCY OF THE EVIDENCE

In his first issue, appellant challenges the legal and factual sufficiency of the evidence in support of the trial court's determination that his parental rights be terminated because he

> (D) knowingly placed or knowingly allowed the child[ren] to remain in conditions or surroundings which endanger the physical or emotional well-being of the child[ren]; [or]

---

[1] For the protection of the identities of the minor children, all adults will be referred to as either appellant, appellee, or by their first name and the initial of their last name. *See* TEX. R. APP. P. 9.8(b).

(E) engaged in conduct or knowingly placed the child[ren] with persons who engaged in conduct which endangers the physical or emotional well-being of the child[ren] . . . .

TEX. FAM. CODE § 161.001(1)(D), (E). On appeal, appellant asserts the evidence at trial "mainly focused on only one instance where [he] may have been neglectful of his parental duties." Appellant does not challenge the sufficiency of the evidence on whether termination was in the children's best interest.

Subsection D of section 161.001(1) requires the endangerment to be the direct result of the child's environment and only an indirect result of a parental act or omission. *In the Int. of R.D.*, 955 S.W.2d 364, 367-68 (Tex. App.—San Antonio 1997, pet. denied). Subsection D thus permits a less than direct relationship between the parental conduct and the endangerment but it also requires an additional factor—an endangering environment—to be proved. *Id.* at 368. Under subsection (E), the focus is on the parent's conduct; one specifically looks to the parent's acts and omissions. *Id.*; *In re P.S.*, 766 S.W.2d 833, 835 (Tex. App.—Houston [1st Dist.] 1989, no writ). If the parent displays a voluntary, deliberate, and conscious course of criminal conduct, it qualifies as conduct that endangers the emotional well-being of the child. *See In re J.N.R.*, 982 S.W.2d 137, 142 (Tex. App.—Houston [1st Dist.] 1998, no pet.). Subsection E requires the endangerment be a direct result of parental conduct and this relationship, standing alone, justifies termination. *In the Int. of R.D.*, 955 S.W.2d at 368. Under the subsection E standard, the endangering parental conduct need not be directed at the child specifically, it need not have caused an actual injury to the child, and it need not even constitute an "actual or concrete" threat of injury to the child. *Id.* Instead, subsection E is satisfied simply by showing a parental course of conduct endangered the child's physical or emotional well-being. *Id.* "Endanger" means "to expose to loss or injury; to jeopardize." *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996); *Texas Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). Although "endanger" means

more than a threat of physical injury or the possible ill effects of a less-than-ideal family environment, it is not necessary that the conduct be directed at the child or that the child actually suffers injury. *Id.*

Here, the petition to terminate appellant's parental rights was filed by the children's mother, appellant's former wife, who is the appellee in this appeal. When appellant and appellee divorced, both had joint custody of their two children who were ten and seven years old at the time of the termination hearing. Prior to the termination hearing, appellant and appellee entered into an agreed judgment regarding his payment of a $15,497.06 child support arrearage. At the time of the termination hearing, appellant testified telephonically because he was incarcerated for assaulting a public servant. Appellant testified he had a criminal history both before and after the July 4, 2010 incident, and that history included domestic violence against a girlfriend in 2009, possession of marijuana in 2010, and assault of another girlfriend in 2011 while he was drunk. Appellant said he had been sober for only eleven months in the past ten years despite being in and out of several rehabilitation facilities. He admitted his drug use and attempts at rehabilitation prevented him from regularly visiting his children.

In 2010, because he had been sober for a few months and he appeared to be doing better, appellee agreed to let appellant have the children over the July 4th weekend. Appellee and her current husband were going to Atlanta, Georgia, and she allowed appellant to use her car for the children's visit. Appellant testified that, on July 4th, he drank alcohol when they arrived at the lake at Ingram Dam and he "then proceeded to lose the keys to [appellee's] car . . . ." Appellant explained he was helping his daughter with the rope swing when the keys fell into the water. While at the lake, appellant met a man and woman who also had children. Because the car keys could not be recovered, this couple drove appellant and his two children back to the couple's house.

At around 11:00 p.m. that evening, appellant and the man decided to walk to a nearby store to buy more alcohol. Appellant said "the woman was sober, and she was helping me out watching the kids because I had a little bit too much to drink, and we were at their house, and me and the husband decided that we were going to go to the store to buy more alcohol." On the way to the store, appellant and the man were arrested for public intoxication. While in jail, appellant assaulted a police officer by "wrestling" with him because he wanted to get out of the jail to see his children. Appellant said he did not intend to leave the children with the woman because he intended to go back to her house after purchasing alcohol, and he had left his phone with the children.

Appellant did not know the name of either the man or the woman or the name of the street where they lived.[2] Appellant conceded he "could have made better choices," but, he did not believe the children were ever in any danger because they were with someone who had children of the same age, the woman was responsible enough to not drink during the holiday, and she never did anything that posed a danger to the children. He said when he left to buy more beer, he thought the children were sleeping. At around 2:00 a.m. the next morning, the woman, whose name is Brandi E., called the Kerrville Police Department to report she had the children and their father had not returned. At trial, when asked whether he continued to engage in criminal behavior and have relapses with his drinking even after the "revelation that [he] did a bad thing when [he] lost his children on the fourth of July," appellant responded, "Technically, yes."

Appellee testified she has been married to her current husband for four years and, if appellant's parental rights are terminated, her husband wants to adopt the children. On the July

---

[2] Appellant could not identify the couple by name at either the August 2, 2010 temporary orders hearing or at the termination hearing held in May 2012.

4, 2010 weekend, she said she lent her car to appellant because she thought it was a safer car and she gave appellant $200 because appellant told her he did not have any money. She said that on the evening of the 4th, she and her husband attended a concert and she did not have her phone with her. When they returned from the concert, she noticed she had a voicemail message from appellant. She said he sounded drunk, and he said the car, not the keys, was in the Ingram Dam, and she needed to call him immediately. She tried calling but he did not answer. Shortly after midnight, she received a call from the Kerrville police. Appellee said a police officer had gone to Brandi's house where they woke appellee's daughter, who was eight years old at the time, and asked her if she could tell them her mother's first name. When the child identified appellee, the officer called appellee to tell her appellant was in jail and the children were with Brandi. Because appellee was so distraught, her husband arranged for his mother and father to drive to Brandi's house to get the children. Later, when appellee retrieved her car, there was "beer everywhere" and the car "reeked."

Appellee said appellant called her later on the afternoon of July 5th asking for the children's whereabouts. She said she asked him to tell her the name of the woman with whom he left the children and he did not answer or explain what happened. Appellee said that after the July 4th incident her daughter urinated on herself every day and night, although she had no urinary tract infection. The daughter also slept on the floor by appellee's bed for three months after the incident, she was "very clingy," and she did not want her mother to go away. Appellee filed the petition to terminate appellant's parental rights in August 2010. Appellee said she thought termination was in the children's best interest because appellant is a "dangerous person, and whether he is sober or not, he is very manipulative, and he causes a lot of pain on [her] daughter, especially." However, appellee admitted that other than the July 4th incident, she

never had any other problems with appellant visiting the children and he never posed a danger to the children.

Appellee also testified she has continued to allow the children to visit with their paternal grandmother and, after the termination petition was filed, the paternal grandmother had supervised visits with appellant and the children. However, in July 2011, the daughter came home from her grandmother's house exhausted. Appellee thought appellant and his mother had fought the entire time they were visiting with the children. Appellee believes appellant's mother is a wonderful person who deserves to be around her grandchildren, but appellant and his mother do not get along well. Appellant's current husband also testified that for several months after the incident when they put the daughter to bed, she would come into their room and sleep on the floor and she would express "a general fear . . . being alone with her father."

Kathryn S., for whom appellee works on a part-time basis, testified she, appellee, and appellee's two children were together at a swimming pool in June 2011. At some point Kathryn asked appellee's daughter about her plans for the July 4, 2011 weekend. Kathryn said the girl referred back to the July 4, 2010 incident, and her entire demeanor changed—the girl slumped, became very sad and tearful, and was obviously upset. Based on her work for a non-profit agency for missing children, Kathryn said she has seen children in many circumstances, parental or non-parental abductions and runaways, and there is always trauma. She believed appellant's daughter had been traumatized by what happened.

Appellant's mother testified the children were bonded to their father and the disagreement referred to by appellee was over "small stuff." However, she agreed that what appellant did over the July 4th weekend was wrong, the incident emotionally endangered the children, and his alcoholism endangers the children. She stated she has told appellant to leave her own house because of his drinking.

After reviewing the entire record, we conclude appellant's inability to remain sober, his history of violence, and his conscious decision to have "too much to drink" and then leave his children with people he did not know so that he could purchase more alcohol demonstrates a course of conduct that endangers his children's well-being. Therefore, we hold the evidence is sufficient to support the trial court's finding under subsection (E) of section 161.001(1).[3]

### APPELLANT'S APPEARANCE AT TRIAL

In his second issue, appellant asserts the trial court erred by denying his motion for new trial on the grounds that, although he appeared telephonically, arrangements were not made for him to appear at trial in person. In his third issue, appellant asserts his trial counsel was ineffective because counsel failed to request a bench warrant to secure his physical presence at trial. We do not address the merits of appellant's second issue because he did not, at trial, object to not being physically present in the courtroom. Therefore, the complaint is waived. *See* TEX. R. APP. P. 33.1; *In re K.A.F.*, 160 S.W.3d 923, 928 (Tex. 2005) (observing that "the rules governing error preservation must be followed in cases involving termination of parental rights"); *In re B.L.D.*, 113 S.W.3d 340, 353 (Tex. 2003) (explaining that, "[i]n termination cases, judicial economy is not just a policy—it is a statutory mandate" and that "[a]ppellate review of potentially reversible error never presented to a trial court would undermine the Legislature's dual intent to ensure finality in these cases and expedite their resolution"). Accordingly, we only address appellant's complaint that trial counsel was ineffective by not securing appellant's physical presence.

---

[3] Along with a best interest finding, which is not challenged in this appeal, a finding of only one ground alleged under section 161.001(1) is sufficient to support a judgment of termination. *See In re E.M.N.*, 221 S.W.3d 815, 821 (Tex. App.—Fort Worth 2007, no pet.). Because we hold the evidence supports the termination of appellant's parental rights under section 161.001(1)(E), we need not address whether the evidence is sufficient to support a finding under section 161.001(1)(D)

An indigent parent in a parental termination case has the right to effective assistance of counsel, and the two-prong test of *Strickland v. Washington*, 466 U.S. 668, 687 (1984), applied in the criminal law context has been adopted as the appropriate standard in termination cases. *In re J.O.A.*, 283 S.W.3d 336, 341-42 (Tex. 2009); *In re M.S.*, 115 S.W.3d 534, 544-45 (Tex. 2003). To prevail on an ineffective assistance claim, an appellant must prove both *Strickland* prongs, establishing that counsel's performance was deficient and that counsel's errors prejudiced the appellant by depriving her of a fair trial whose result is reliable. *In re M.S.*, 115 S.W.3d at 545 (citing *Strickland*, 466 U.S. at 687). Failure to prove either prong of the *Strickland* test will defeat an ineffective assistance claim. *See id.*

On appeal, appellant contends counsel's failure to obtain a bench warrant falls below an objective standard of reasonableness and, thus, satisfies the first prong of *Strickland*. Appellant contends he "desperately wanted to be present" at the trial. He also argues this is a "close case" and there is a reasonable probability the result of the trial would have been different if the trial court could have observed him in person. The record does not support appellant's contentions, especially because he participated at trial telephonically. Appellant's argument requires us to speculate about counsel's reasons for not obtaining a bench warrant, which we cannot do. Without affirmative evidence in the record to overcome the presumption of reasonable assistance, we are not persuaded by appellant's claim of ineffective assistance of counsel.

## CONCLUSION

We overrule appellant's issues on appeal and affirm the trial court's Order of Termination.

Sandee Bryan Marion, Justice