Affirmed and Opinion filed October 17, 2002









Affirmed
and Opinion filed October 17, 2002.

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-01-01042-CV

____________

 

IN THE INTEREST OF J. R., A CHILD

 

 



 

On Appeal from the 300th District Court

Brazoria County, Texas

Trial Court Cause No. 11905*RH00

 



 

O P I N I O N

Brazoria County Children’s Protective Services (CPS) received
a referral regarding J. R., a six-year-old boy, after his mother, H. R.,
was arrested for driving with a suspended license.  CPS was unable to find a suitable relative or
other person to care for J. R., so he was placed in foster care.  After efforts to reunite J. R with H. R were
unsuccessful, CPS filed a petition to terminate H. R=s parental rights.  

Following a jury trial, H. R.’s
parental rights were terminated.  On
appeal, H. R. challenges the legal and factual sufficiency of the jury=s findings.  For the reasons given below, we affirm.








FACTUAL AND PROCEDURAL BACKGROUND

J. R. was born in 1993 to H. R. and her common-law husband,
Jack Glidden.  H. R. described their home
as a nice, happy and safe environment. 
Glidden owned rental property and had an income.  H. R. and Glidden took J. R. fishing, to
carnivals, and entered him in Little League T-ball.  They also had chickens, a horse, three dogs,
and a pig.  According to H. R., J. R.
loved to feed the chickens.  Glidden did
not physically abuse J. R.  However,
Glidden physically abused H. R., and once hit her in the head with a baseball
bat. 

In 1999, Glidden suffered a heart attack and died.  H. R., who had a history of alcohol abuse,
began abusing illegal drugs, particularly crack cocaine.  After a dispute with Glidden’s older
children, H. R. and J. R. were evicted from their home.  H. R. and J. R. then lived with a man named
Oscar Valdez, whom H. R. had Adated@ both before and after Glidden died, for several months.  At the time J. R. was taken into custody, H.
R. and J. R. lived with a man named Eloy Torres, who was convicted of public
intoxication while they were together. 

On May 10, 2000, H. R. was arrested for driving with a
license that was suspended due to a conviction for driving while
intoxicated.  As a result of her arrest,
J. R., who was then six years old, was referred to CPS on an allegation of
neglectful supervision by H. R.[1]  When J. R. was taken into custody, he lacked
basic life skills, such as the ability to dress himself, brush his hair or
teeth, or print or write his name.  He
was not enrolled in school but was home-schooled by H. R.  J. R. also had difficulties with toilet
training, and suffered from enuresis and encopresis.  He was overweight, and even though he was
only six years old, he wore men’s size clothes. 
J. R. also suffered from breathing problems believed to be asthma.  When his medication was retrieved for him, it
was found to have exceeded its expiration date by over one year.








CPS attempted to find a relative with whom to place J. R, but
no appropriate placement could be found. 
H. R. suggested that her boyfriend take J. R., but when police officers
located him, he was found to be intoxicated and, therefore, was not an
appropriate placement.[2]  At the time of her arrest, H. R. had told the
police and a CPS caseworker that she and J. R. were homeless. 

When the CPS caseworker met with J. R. at the police station,
he was very upset and was crying.  J. R.
told the caseworker that he did not know anyone else he could live with, and
that his grandparents and father were deceased. 
J. R. also stated that, while H. R. did not leave him alone, she was
often intoxicated and would pass out in front of him.  Although the caseworker was unable to
determine if J. R. had been abused, he was able to determine that the child was
neglected.  J. R. was taken into CPS
custody and placed in foster care.

H. R. was released from jail the next day.  Several days later, she appeared at CPS
offices for a Permanency Planning Team (PPT) meeting.  During the meeting, the CPS caseworker
noticed that H. R. smelled of alcohol. 
H. R. told him that she was nervous before the meeting and so had “a
couple of beers and some marijuana.”[3]


The goal of the PPT meeting was to inform H. R. of the steps
she would need to take to reunite J. R. with her and provide him a safe
home.  The services that were recommended
for H. R. included a psychological evaluation, individual counseling, parenting
classes, a drug and alcohol assessment, and random urinalysis.  It was also recommended that H. R. have supervised
visits with J. R. at CPS offices twice a month for one hour each.  H. R. indicated that she understood the
services and indicated that she was willing to comply.  She later signed a temporary court order
agreeing to the recommendations.  Under
the order, H. R. was required to remain drug and alcohol free. 








While H. R. eventually completed some of the court-ordered
services, she missed many of her treatment and counseling sessions that were to
take place at the Gulf Coast Center, and several times tested positive for
drugs.  She also missed several of the
scheduled visits with J. R., canceling some, leaving early from some, and
failing to appear for others.  During
this time, she was also convicted of several crimes, and was placed on
probation in April of 2001.[4]  In connection with her probation, H. R. was
ordered by the criminal court to complete anger management and DWI classes, and
to submit to periodic urinalysis tests.

In foster care, J. R. made significant improvements.  He attained a healthier weight and his
breathing problem subsided.  His problems
with enuresis and encopresis also improved, although there were sometimes
setbacks after visiting with H. R.  After
approximately four months in foster care, J. R. alleged possible sexual abuse
by AOscar.@[5]

On May 25, 2001, CPS filed a petition to terminate the
parent-child relationship between H. R. and J. R.  

After several of the urinalysis tests conducted by the
probation department came back positive for cocaine, the probation department
gave H. R. the option of entering an intensive in-patient treatment program
known as Door to Recovery or serving 180 days in jail.  H. R. opted for the program, and eventually
completed it in August of 2001. 
Urinalysis tests conducted by the probation department since June of
2001 were negative.  

A jury trial on the termination of H. R.’s
parental rights began on October 16, 2001. The jury found that H. R. had
committed four of the acts or omissions identified as grounds for termination
in the Texas Family Code, and also found that termination of H. R.’s parental rights was in the best interest of the
child.  The trial court signed the order
of termination on October 22, 2001.  This
appeal followed.








ISSUES ON APPEAL

On appeal, H. R. raises nine issues.  The first seven issues challenge the legal
and factual sufficiency of the evidence in support of the statutory grounds for
termination.  In the eighth and ninth
issues, H. R. challenges the legal and factual sufficiency of the finding that
termination was in J. R.’s best interest.

The Standard of Review

When presented with a challenge to the legal sufficiency of
the evidence, we must consider all of the evidence in a light most favorable to
the party in whose favor the verdict was rendered, indulging every reasonable
inference in that party’s favor.  Associated Indem. Corp.
v. Cat Contracting, Inc., 964 S.W.2d 276, 285‑86
(Tex. 1998).  If there is any
evidence of probative force to support the finding, the finding must be
upheld.  ACS
Investors, Inc. v. McLaughlin, 943 S.W.2d 426, 430 (Tex. 1997).  In reviewing the factual sufficiency of the
evidence, we consider all of the evidence in record, including any evidence
contrary to the judgment.  Plas-Tex, Inc.
v. U. S. Steel Corp., 772 S.W.2d 442, 445 (Tex.
1989).  We must
determine whether the evidence is such that a reasonable jury could form a firm
belief or conviction as to the truth of the allegations sought to be
established.  In re C.H., ___
S.W.3d ___, (Tex. 2002) (No. 00-0552, July 3, 2002).

Termination of Parental Rights

The natural right existing between parents and their children
is one of constitutional dimensions.  See
In re J.W.T., 872 S.W.2d 189, 194B95 (Tex. 1994).  Termination of the parent-child relationship
is final and irrevocable and divests for all time the parent and child of all
legal rights, privileges, duties, and powers with respect to each other except
for the child’s right to inherit.  See
Holick v. Smith, 685 S.W.2d 18,
20 (Tex. 1985).  Consequently,
termination proceedings should be strictly scrutinized, and involuntary
termination statutes should be strictly construed in favor of the parent.  Id.








In proceedings to terminate the parent‑child
relationship brought under section 161.001 of the Family Code, the petitioner
must establish one or more acts or omissions enumerated under subsection (1) of
the statute and must additionally prove that termination of the relationship is
in the best interest of the child.  See
Tex. Fam. Code Ann. ' 161.001(1)B(2). 
Both elements must be established, and proof of one element does not
relieve the petitioner of the burden of proving the other.  See Holley v. Adams, 544
S.W.2d 367, 370 (Tex.1976). 
Because termination of parental rights is such a drastic remedy and is
of such weight and gravity, the petitioner is required to justify termination
by “clear and convincing evidence.”  See
Tex. Fam. Code Ann. ' 161.001; In re G.M., 596 S.W.2d 846, 847
(Tex. 1980).   

The jury’s charge submitted in this case tracked the grounds
specified in section 161.001(1)(D), (E), (O), and
(P).  These subsections provide for
termination if the court finds the parent has:

(D)  knowingly placed or knowingly allowed the child to remain in
conditions or surroundings which endanger the physical or emotional well-being
of the child;

 

(E)  engaged in conduct or knowingly placed the child with
persons who engaged in conduct which endangers the physical or emotional
well-being of the child;

 

(O)  failed to
comply with the provisions of a court order that specifically established the
actions necessary for the parent to obtain the return of the child who has been
in the permanent or temporary managing conservatorship of the Department of
Protective and Regulatory Services for not less than nine months as a result of
the child’s removal from the parent under Chapter 262 for the abuse or neglect
of the child;

 

(P)  used a
controlled substance, as defined by Chapter 481, Health and Safety Code, in a
manner that endangered the health or safety of the child, and:

 

(i)        failed to complete a court-ordered
substance abuse treatment program; or 

(ii)       after completion of a court-ordered
substance abuse treatment program, continued to abuse a controlled substance.








Tex. Fam. Code Ann. ' 161.001(1)(D),
(E), (O), and (P).  The jury also found,
consistent with section 161.001(2), that termination was in the best interest of
the child.  See Tex. Fam. Code Ann. ' 161.001(2).

1.         Did H. R. knowingly
place or knowingly allow J. R. to remain in conditions or surroundings which
endangered his physical or emotional well-being?

In her first two issues, H. R.
contends that the evidence is legally and factually insufficient and did not
show by clear and convincing evidence that termination under Texas Family Code
section 161.001(1)(D) was appropriate.  Under section 161.001(D), the child’s
environment, as opposed to the parent=s conduct, is the focus of the source
of endangerment to the child.  See In
re B.S.T, 977 S.W.2d 481, 484 (Tex. App.CHouston [14th Dist.] 1998), disapproved
on other grounds, In re C.H., ___ S.W.3d ___, (Tex. 2002) (No.
00-0552, July 3, 2002).  However,
the parent must have “knowingly” placed the child in an environment that
endangered his physical or emotional well-being.  Id. 
As used in the statute, the term “endanger” means more than a threat of
metaphysical injury or the possible ill effects of a less-than-ideal family
environment, but it is not necessary that the conduct be directed at the child
or that the child actually suffers injury. 
Texas Dept. of Human Servs.
v. Boyd, 727 S.W.2d 531, 533 (Tex. 1987). 
Rather, “endanger” means to expose to loss or injury; to
jeopardize.  Id.








Here, H. R. admitted to driving while
intoxicated several times while J. R. was in the vehicle.  She also admitted that the day she was
arrested for driving while intoxicated, she intended to pick up J. R.  The jury also heard evidence that on another
occasion, an unidentified man found her in her car with J. R. on the side of
the road and took them to the emergency room, where H. R., who was intoxicated,
spent much of the time either asleep or unconscious as J. R. cried and begged
his mother to wake up.  J. R. told the CPS
caseworker who initially investigated J. R.’s
circumstances that while H. R. did not leave him alone, she was often
intoxicated or unconscious in front of him, effectively leaving him alone.  The caseworker also testified that, based on
the circumstances at the time J. R. was picked up, he was in physical and
mental danger, and J. R.=s removal from H. R. was necessary to protect him at that
time.  He also testified that, while he
was unable to determine if J. R. had been abused, he was able to determine that
he was neglected.  There was also
evidence of two earlier referrals to CPS in January and February of 2000.  There was also evidence that J. R. had been
left alone on at least one occasion with Oscar Valdez, who may have sexually
abused him. 

H. R. contends that she did not know
about the allegation of sexual abuse until after J. R. was taken into
foster care, there was no evidence that J. R. was physically abused, and the
only reason that J. R. was taken into custody was that H. R. was arrested and
no suitable relatives could be found to take him.  While we agree that the evidence is
insufficient to show that H. R. knowingly left J. R. with a man who may have
sexually abused him, H. R.’s selective recitation of
the evidence ignores the additional evidence that J. R.=s environment jeopardized his
physical and mental well-being.  When J.
R. was taken into CPS custody at the age of six, he was developmentally delayed
and had not learned many basic life skills, such as dressing himself or
brushing his hair and teeth.  In
addition, J. R. suffered from enuresis and encopresis, and evidence was
presented that these problems were psychological in origin and there was no
medical explanation for them.  

J. R. also was extremely overweight,
and H. R. admitted that he was allowed to eat whatever he wanted.  J. R. had difficulty breathing due to what
was believed to be asthma, but the asthma medicine H. R. had for him exceeded
its expiration date by over one year. 
Moreover, although H. R. knew that smoking around J. R. could be harmful
to him because of his asthma, she admitted to smoking around him anyway.








Additionally, when J. R. was taken
into CPS custody, he was not in school. 
H. R. testified that she had taken him out of school and was
home-schooling him.  The jury heard
evidence that H. R. had borderline intellectual functioning and academic skills
on a third-grade level.  H. R. testified
that she did not complete the eleventh grade (but also told others she only
completed either the eighth or ninth grade), and failed the G.E.D. three
times.  H. R. admitted that she was
not qualified to teach J. R. 

H. R. testified that she never left
J. R. alone, but she also stated that he was not with her when she was in jail
or using drugs.  She explained that, when
using drugs, she left J. R. with someone else. 
While H. R. testified that she did not drink in front of J. R., she
later admitted that she did drink beer in front of him.  She also testified that when she was in the
hospital for an operation on her hand, she left J. R. with her then-boyfriend
Oscar Valdez, who, it was alleged, may have sexually abused J. R.  Even if she did not knowingly leave
J. R. with an abuser, however, there was testimony that she suggested
Oscar as a placement for J. R. when she was arrested, but he was found to be
intoxicated at the time.[6]
Consequently, he was found to be an unsuitable placement for J. R.

Viewing the totality of the evidence,
we find that a reasonable jury could form a firm belief or conviction that H.
R. knowingly placed J. R. in an environment that endangered his physical or
emotional well-being.  Therefore, we
overrule H. R.=s first and second issues.

2.         Did H. R. engage in conduct or knowingly place J. R. with
persons who engaged in conduct that endangered his physical or emotional
well-being?

In H. R.’s
third issue, she contends that the evidence is factually insufficient and did
not show by clear and convincing evidence that termination under Texas Family
Code section 161.001(1)(E) was appropriate.  H. R. does not challenge the legal
sufficiency of the evidence.








Under subsection (E), the cause of
the danger to the child must be the parent=s conduct alone, including the parent=s actions or omissions or failures to
act.  In re B.S.T.,
977 S.W.2d at 484.  Neglect can
endanger a child=s well-being as easily as abusive behavior.  In re D.L.N., 958 S.W.2d 934, 938 (Tex.
App.CWaco 1997), disapproved on other grounds, In re
C.H., ___ S.W.3d at ___.  Evidence
demonstrating a course of conduct which has the effect of endangering the
physical or emotional well-being of the child is sufficient to support a finding
under subsection (E).  Boyd, 727 S.W.2d at 534. 

H. R. contends that the jury’s
finding must be set aside because there was insufficient evidence that H. R.
had any knowledge of the possibility that J. R. had been sexually abused, there
was insufficient evidence she physically abused J. R., and J. R. would not have
been removed from H. R.’s care on May 10, 2000 if a
suitable relative could have been found to take him.  H. R. describes J. R. as “a well-fed child
with a weight problem.”  H. R. also
points to evidence that she had provided him with medical treatment, including
taking him to the doctor on several occasions regarding his enuresis and encopresis.  H. R. contends that J. R.’s continuing problem with enuresis and encopresis
demonstrates that H. R. was not the sole cause of the problem.  








Regarding the allegation of sexual
abuse, there is no evidence that H. R. was aware that J. R. may be have been sexually abused. 
The evidence shows that J. R. did not make an allegation of sexual abuse
until after he had been in foster care for several months.  At that time, he apparently told the foster
parents that AOscar@ had “done something” to him.  There was testimony that some behavior J. R.
exhibited, such as enuresis and encopresis, was sometimes associated with
sexual abuse.  The jury also heard
testimony that J. R.=s problems appeared to be
psychological in origin, and no medical cause had been found.  There was also testimony that children may
suffer from enuresis and encopresis from causes
unrelated to sexual abuse.  The evidence
was unclear as to when J. R. may have began suffering
from these problems.[7]  Finally, there was no evidence that criminal
charges had been brought against Valdez. 
On this record, we find the evidence of sexual abuse is inconclusive for
the purpose of determining whether H. R. knowingly placed J. R with a person
who endangered his well-being, and the evidence is insufficient to show that H.
R. knowingly left J. R. with a man who may have sexually abused him.  We also agree with H. R. that there is
insufficient evidence that she physically abused him, and CPS does not argue
that she did.  

Nevertheless, H. R.’s
selective rendition of the facts ignores considerable evidence supporting the
jury’s finding that she engaged in conduct that endangered his physical or
emotional well-being.  There is
considerable evidence H. R. neglected J. R. and her own course of conduct
endangered him.  As discussed in the
previous section, H. R. admitted to driving while intoxicated several times
with J. R. in the car, and admitted that the day she was arrested for driving
while intoxicated, she intended to pick up J. R.  Moreover, there was evidence that on one
occasion J. R. had to sit in a hospital with H. R., who was asleep or
unconscious from alcohol, crying and begging his mother to wake up.  

Phil Packwood, a clinical social
worker who had treated both J. R. and H. R., testified that the incident at the
hospital constituted emotional abuse.  He
also testified that, while there was no indication that H. R. had been
physically abusive to J. R., she had been emotionally abusive to him.  He explained that J. R. was very quiet, and
there was not much conversation between J. R. and H. R.  He described J. R. as a scared and frightened
child.  Similarly, others testified that,
while H. R. was loving and affectionate toward J. R., and the two would play
together, they did not talk much.  There
was also testimony that, while in foster care, J. R. did not ask to see or
speak to his mother.

 








H. R. admitted that a parent who
would allow a child to be around persons who were under the influence of drugs
and alcohol to the point they were intoxicated would be neglectful and harmful
to the child.  She admitted that she
drank beer in front of J. R. (although she denied using drugs in front of him),
and there was evidence that she was often intoxicated and unconscious in front
of J. R.  There was also evidence that at
the time of her arrest, H. R. suggested her boyfriend as a possible placement
for J. R., but when he was located he was found to be intoxicated.  H. R. admitted she endangered J. R. because
of her drug and alcohol abuse.  H. R.
also admitted she had been in and out of jail several times, and this
endangered J. R. because she could not be there for him, parent him, or provide
him a safe and stable home when she was in jail.  

Additionally, as described above, at
the time J. R. was taken into custody, he lacked basic life skills.  The jury heard testimony that J. R.’s lack of such basic skills was caused by H. R.’s lack of parenting. 
J. R. also had learning difficulties. 
Nevertheless, H. R. took J. R. out of school and was allegedly
home-schooling him, even though she admitted she was not qualified to do
so.  J. R. was also suffering from a
breathing problem believed to be asthma, but the only medication found for him
was out of date, and H. R. admitted to smoking around J. R. despite her
knowledge that it could be harmful to an asthmatic child.  

J. R. was also very overweight.  H. R. argues that J. R. was merely a “well-fed”
child with a weight problem, but the testimony indicated that the problem was
more severe than that.  At age six, J. R.
was wearing adult men=s clothing, and had breathing problems exacerbated by his
weight and poor physical fitness.  The
jury heard evidence that, while in foster care, J. R. lost weight and no longer
required asthma medication.  His foster
parents taught him appropriate eating habits and encouraged him to get physical
exercise.  

H. R. also contends that J. R.’s continuing enuresis and encopresis while in foster
care was evidence that H. R. was not the sole cause of those problems.  H. R. testified that J. R. had always had
these problems even though she tried to toilet-train him, and also testified
that she took him to the doctor several times for evaluation.  However, H. R. presented no evidence that J.
R. had ever been diagnosed as having a medical cause for the problems.  A physician who treated J.
R. while he was in foster care testified that his problems appeared to be
psychological.  Moreover, while in
foster care, J. R.=s enuresis and encopresis improved,
but he sometimes experienced setbacks, including after his visits with H.
R.  Given this evidence, the mere fact
that J. R. had not completely overcome these difficulties by the time of trial
is not dispositive.[8]









We find that a reasonable jury could
form a firm belief or conviction that H. R. engaged in conduct or knowingly
placed J. R. with persons who engaged in conduct which endangered his physical
or emotional well-being.  Therefore, we
overrule H. R.=s third issue.

3.         Did
H. R. fail to comply with the provisions of a court order that specifically
established the actions necessary for her to obtain the return of J. R.?

In issues four and five, H. R.
contends that the evidence is legally and factually insufficient and did not
show by clear and convincing evidence that termination under Texas Family Code
section 161.001(1)(O) was appropriate.  This section provides that the court may
order the termination of the parent-child relationship if the court finds by
clear and convincing evidence that the parent has:

failed to comply with the provisions of a court order
that specifically established the actions necessary for the parent to obtain
the return of the child who has been in the permanent or temporary managing
conservatorship of the Department of Protective and Regulatory Services for not
less than nine months as a result of the child=s
removal from the parent under Chapter 262 for the abuse or neglect of the
child.

Tex. Fam. Code Ann. ' 161.001(1)(O).  

Under the temporary orders issued in
this case, H. R. was to (1) submit to a psychiatric evaluation, (2) complete
parenting classes, (3) complete counseling, (4) complete a drug and alcohol
abuse assessment, (5) remain drug and alcohol free and submit to random drug
and alcohol screenings, (6) complete anger management classes, (7) maintain a
safe and stable home environment, and (8) comply with the requirements of the
service plan filed with the court by CPS.  









H. R. argues that the language in the
statue is vague and does not state with any particularity what is necessary to
be considered to be in compliance with the order. Additionally, H. R. contends,
the temporary orders in the case do not set time deadlines to complete the
court-ordered services.  In support of
her argument, H. R. posits the following evidence:  (1) she completed the requirements of the
temporary orders pertaining to the psychological evaluation, parenting classes,
and counseling; (2) while not initially compliant with the requirement that she
complete alcohol and drug counseling, she eventually completed the Door to
Recovery program as required by the terms of her probation and has remained Aclean and sober@; and (3) there is no evidence she
did not maintain a safe and stable home because there was no testimony that
anyone ever went to her home to determine if the environment would be safe and
stable for J. R.  Accordingly, she
contends, she has completed the court-ordered requirements.  We disagree.

One of the requirements of the court
order was that H. R. remain drug and alcohol- free and
submit to random urinalyses during the pendency of the suit.  Despite the orders, H. R. admitted she
drank alcohol and smoked crack cocaine, her Adrug of choice.@ 
A counselor at the Gulf Coast Center testified that H. R. tested
positive for cocaine, alcohol, and marijuana during random urinalyses.  She also testified that H. R. missed therapy
sessions even when she was provided with transportation.  In addition, H. R. did not attend all the
support group meetings at the Gulf Coast Center.  For the first ten months J. R. was in foster
care, H. R. did not comply with the terms of the court=s order, and it was not until she was
given the option by her probation officer in a criminal matter to either admit
herself into a drug program or go to jail for violating her probation that she
was able to complete a drug and alcohol program.  Indeed, H. R. admitted she did not comply
with the family court=s order.  We reject H.
R.=s argument that satisfying some of the court=s requirements and completing a
treatment program ordered by another court somehow negates the requirement that
she comply with the all of the terms of the order in this case.








H. R. directs us to the case of In
re P.S., 766 S.W.2d 833, 840 (Tex. App.CHouston [1st Dist.] 1989, no writ),
in which it was stated in dicta that the parents= failure to meet the level of conduct
specified in the parent-agency agreement does not, by itself, justify the
termination of their parental rights. 
However, when the court made that comment, it was considering whether
the evidence was factually sufficient to show that the parents engaged in
conduct, or knowingly placed their children with persons who engaged in
conduct, that endangered the children=s physical or emotional well-being_not whether they had failed to comply with the
provisions of a court order.  See id. at 838B39.  Moreover, the
court found that the evidence was insufficient because the agency did not show
by clear and convincing evidence that the children had been harmed while in
their mother=s care, and the parents= actions demonstrated their
continuing commitment to the return of their children.  See id. at
839B40. 
Such is not the case here.  While
it is undisputed that H. R. loves her son, there is considerable evidence that
her conduct has been detrimental to J. R. 
There is also legally and factually sufficient evidence from which a
reasonable jury could form a firm conviction or belief that H. R. failed to
comply with the court=s orders, not merely that she failed to live up to an
agreement with CPS.  

Accordingly, we overrule H. R.=s fourth and fifth issues. 


4.         Did
H. R. use a controlled substance, as defined by Chapter 481, Health and Safety
Code, in a manner that endangered J. R.=s health or safety and fail to complete a
court-ordered substance abuse treatment program or continue to abuse a
controlled substance after completion of a court-ordered substance abuse
treatment program?

In her sixth and seventh issues, H.
R. contends the evidence is legally and factually insufficient and did not show
by clear and convincing evidence that termination under Texas Family Code
section 161.001(1)(P) was appropriate.  H. R. contends CPS did not introduce
sufficient evidence to satisfy any of the requirements of this section.  Again, we disagree.








First, H. R. contends that CPS did
not introduce any evidence that H. R. used a controlled substance as defined by
Chapter 481 of the Health and Safety Code. 
H. R. ignores the fact that she admitted to using crack cocaine, her Adrug of choice,@ and tested positive for drugs on
several occasions.  Although H. R. denied
using marijuana, a counselor at the Gulf Coast Center testified H. R. had
tested positive for marijuana as well as for alcohol and cocaine.  Cocaine and marijuana are classified as
controlled substances in Chapter 481.  See
Tex. Health & Safety Code Ann.
'' 481.102(3)(D)
(cocaine); 481.121 (possession of marihuana).

Next, H. R. contends CPS did not
prove by clear and convincing evidence that H. R. used controlled substances Ain a manner that endangered the
health and safety of the child@ because H. R. testified that she did not smoke any drugs in
front of J. R. and no other evidence was introduced showing she used any other
type of controlled substance around J. R. 
However, H. R. admitted that her drug use endangered J. R.  H. R. also admitted she had been in and out
of treatment programs and on and off drugs for the last several years.  She continued to use drugs in violation of
the court=s order even though the failure to
comply with the order could lead to the termination of her parental
rights.  Therefore, the evidence was
sufficient to support this element of section 161.001(P).

Finally, H. R. contends that even if
she was shown to have used a controlled substance in a manner that endangered
J. R., CPS did not show that H. R. either (1) did not complete a court-ordered
substance abuse treatment program, or (2) continued to abuse a controlled
substance after completing a court-ordered substance abuse treatment
program.  The crux of this argument is
that because H. R. completed the Door to Recovery program ordered by a criminal
court and has since remained drug and alcohol free, CPS did not satisfy the
statutory requirements.  We do not need
to reach this argument, however, because it is undisputed that H. R. did not
complete the drug and alcohol counseling ordered by the family court and
continued to test positive for alcohol and drugs while J. R. was in CPS custody.  It was only after H. R. continued to have
positive urinalysis tests and her probation officer in the criminal case gave
her the option of entering the Door to Recovery program or going to jail for
violation of her parole that she successfully completed a substance abuse
program.  

We overrule H. R.=s sixth and seventh issues.

5.         Was
termination in the best interest of the child?

In her eighth and ninth issues, H. R.
contends the evidence was legally and factually insufficient and did not show
by clear and convincing evidence that the termination of H. R.=s parental rights was in the best interest of J. R.

As noted above, to terminate the
parent-child relationship, CPS must establish not only one or more of the acts
or omissions enumerated under section 161.001(1), but also must prove, by clear
and convincing evidence, that termination of the relationship is in the best
interest of the child.  See Tex. Fam. Code Ann. ' 161.001; Holley, 544 S.W.2d at 370.  In
Holley, the Supreme Court identified some factors to examine in
ascertaining the best interest of a child, which included:  (1) emotional and physical needs of the child
now and in the future; (2) the emotional and physical danger to the child now
and in the future; (3) the parental abilities of the parent seeking custody;
(4) the programs available to assist the parent seeking custody; (5) the plans
for the child by the parent or the agency seeking custody; (6) the stability of
the home or the proposed placement; and (7) any acts or omissions of the parent
which may indicate that the existing parent‑child relationship is not a
proper one.  Holley,
544 S.W.2d at 371B72.  These factors are not exhaustive, and not all
of them must be proved as a condition precedent to parental termination.  See id. at
372; In re C.H., ___ S.W.3d at ___. 
Because the relationship between a parent and child is one of
constitutional dimensions, we recognize the presumption that the best interest
of the child will be served by preserving the parent‑child
relationship.  Wiley
v. Spratlan, 543 S.W.2d 349, 352 (Tex. 1976).




a.         The Relevant
Factors

(i)        Parental
abilities of the person seeking custody








The evidence discussed above showed
that H. R. made poor choices for her son, and by her own admission her actions
endangered J. R.=s physical and mental
well-being.  In addition to this
evidence, H. R. testified she suffered from paranoid schizophrenia and had had
hallucinations since she was eight years old. 
She testified that a doctor had prescribed medications for her,
including Prozac and Risperdal, but, contrary to the doctor=s orders, she stopped taking them
when she began feeling better.  She said
she was not taking her medication at the time she attended the PPT meeting in
May of 2000, but was taking it now.

H. R. testified that she has
contemplated suicide, the last time after J. R. was taken into custody.  She admitted that, before J. R. was born, she
had attempted suicide by taking rat poison. 
About a month after J. R.=s father died, she tried to commit
suicide by taking pills.  She has also
tried to cut her wrists. 

H. R. also acted inappropriately
toward J. R.  While J. R was in foster
care, H. R. wrote a letter to him in which she said that if she did not get him
back she would kill herself.  At the
bottom of the letter, she also accused J. R. of lying.  H. R. explained that she wrote that because
she had watched a movie depicting a true story in which CPS personnel were
interrogating a child and trying to get him to say certain things, and so she
thought the same thing might be happening to J. R.  She also claimed she was referring in part to
J. R.=s statement that Oscar had abused him, but she had no idea if
he was telling the truth.  H. R. wanted
to confront J. R. about his allegation of sexual abuse, even though she had
been counseled that it was inappropriate to do so and could be harmful to J. R.  H. R. made inappropriate statements to J. R.
when they interacted, such as telling him she wanted him to come home or that
she was working on getting him home. 

H. R. testified that, while she had
made some mistakes in the past and had some difficulty complying with the
court-ordered services, she loved her son and could give him a stable
home.  She testified that since
completing the Door to Recovery program, she has been sober and drug free.  As a result of the program, she better
understood the dangers of drug and alcohol abuse, and was now equipped to deal
with her addictions.  The evidence showed
that since attending the Door to Recovery Program, she has attended counseling
and support group sessions, has visited J. R. regularly, and has had negative
urinalysis tests. 








In contrast to H. R.=s testimony, the jury heard other
witnesses testify that H. R.=s parental rights should be terminated.  Terri Martin, one of J. R.=s caseworkers, testified that H. R.=s rights should be terminated because
J. R. needed a safe home, a structured lifestyle, and to be able to rely on the
people who are around him every day, and she did not believe H. R. could
provide that for him.  She believed J. R.
could never be returned to H. R., and the best place for him at that time was
to remain with his foster parents, Kenneth and Gloria Rogers, because they were
able to meet all his needs.  Martin
maintained that termination was appropriate even though H. R. is now drug and
alcohol free, because she had been untruthful about her drug use in the past
and had a long history of relapses.  She
said it would be detrimental to J. R. if H. R. had another relapse.  Martin also believed that J. R.=s lack of basic life skills was caused by H. R.=s lack of parenting, and throughout
the pendency of the case H. R. had never demonstrated that she could provide a
safe and stable home for J. R.

Phil Packwood, the clinical social
worker who had treated both J. R. and H. R., testified that, while H. R. was
very loving toward J. R. in therapy, he was concerned about H. R.=s ability to parent J. R. because of
the combination of his special needs and H. R.=s bad choices in the past.  He also questioned whether H. R. would ever
be able to parent J. R.  He testified
that using alcohol for twenty years could cause after-effects that would affect
a person=s ability to make correct, reasonable
and proper choices.  Similarly, Dr. Joann
Baer, a clinical psychologist who evaluated H. R., testified that in her
opinion H. R. showed poor judgment and very limited insight into her situation,
her responsibilities, and her ability to handle situations as a parent, and she
was not likely to change in the future. 
She testified that H. R. was not able to provide a safe, stable, and
nurturing environment for her son.  She
maintained this opinion even after reevaluating H. R. in July 2001.








Kimber Marshall, J. R.=s guardian ad litem, testified that it was in J. R.=s best interest that H. R=s parental rights be terminated.  She testified that when she met J. R., he was
very obese, was very shy and quiet, and had few life skills.  He could not write or spell his name, eat
with utensils, dress himself or tie his shoes. 
He hoarded food and did not know how to eat a normal meal.  She stated that, in her opinion, H. R. always
put herself and her needs before J. R.=s needs.  While acknowledging that making CPS J. R.=s permanent managing conservator was an alternative to
termination, Marshall testified that option would not meet J. R.=s needs.  She noted that for ten months, H. R. did not
do the minimum necessary to get J. R. back, and she continued to have positive
urinalysis tests until she was ordered to the Door to Recovery=s in-patient drug treatment by the
criminal court, not the court below.  She
also believed the chances were great that H. R. would relapse.

Others also testified that H. R. was
at high risk of relapsing into using drugs and alcohol.  Packwood testified that he was concerned
about H. R.=s ability to cope with stressful
situations, such as if J. R. were to get into trouble at school, because H. R.
has shown that whenever she has a major problem she goes back to abusing
drugs.  Indeed, H. R. admitted she turned
to drugs or alcohol when bad things happened in her life.  And, while she stated it was her desire not
to use alcohol or drugs again, she agreed it was possible that she could have a
relapse, and agreed that a relapse would endanger J. R.  

Donna Longbine, one of H. R.=s counselors at the Gulf Coast Center, testified that H. R
was at a high risk for relapse, particularly if she did not follow all the recommendations
to attend support groups.  Longbine
testified she recommended that, after H. R. completed the Door to Recovery
program, she continue with various support groups as an important part of her
continuing treatment for substance abuse. 
Longbine said H. R. had missed some support group meetings since
completing the Door to Recovery program. 
H. R. admitted that, although one of her counselors had recommended she
attend Alcoholics Anonymous every day, she had not done so.  Dr. Baer testified H. R. tended to minimize
her substance abuse problems, and without some sort of intensive therapy and
support, her prognosis was very poor. 
Moreover, because H. R. had a combination of mental illness and
substance abuse, she needed to continue medication and maintain a strong
support system in order to maintain her sobriety.  In her opinion, H. R. was a very high risk
for relapse. 

Only one witness, Tyrone Thomas,
testified that the alternative option of making CPS J. R.=s permanent managing conservator
should be considered.  Thomas was the CPS
caseworker who succeeded Terri Martin, and his initial contact with H. R. was
in March of 2001, when H. R. was in the Door to Recovery program.  He described H. R. as a person who had been
through tough times and Adone a lot of wrong,@ but who was trying to make a
change.  In his opinion, certain bonds
had been established between J. R. and H. R., and he would dispute the opinion
of a therapist who opined that there was a problem with bonding between them. 

Thomas testified that, after H. R.=s release from the program, she contacted him and they
scheduled her visits with J. R.  He did
not recall her missing any visits while he was involved in the case.  He testified H. R. and J. R. played well
together during the visits, and J. R. interacted well with H. R. and her
fiancé, Jose Ramirez.[9]  He described the visits between H. R. and J.
R. as involving more playing and interacting than verbal communication, and he
believed that H. R. and J. R. demonstrated appropriate affection toward each
other. 

Nevertheless, Thomas testified that
H. R.=s ability to make choices for J. R. was limited, and he
believed J. R. should not be returned to her at the present time.  He testified H. R. was not capable of
parenting J. R.  He agreed that merely
completing classes did not make one a better parent, and H. R. needed more help, counseling, and support services.  Thomas agreed that J. R.=s placement with the Rogers was going
well and he had made progress.  Thomas
also testified that, at the present time, the Rogers were able to meet J. R.=s needs, but H. R. could not.




(ii)           
Emotional
and physical needs of the child now and in the future

As discussed above, the jury heard
evidence that, at the time J. R. was taken into CPS custody at the age of six,
he had not learned basic life skills such as dressing himself, or brushing his
hair and teeth, and had problems with enuresis and encopresis for which no
medical cause was found.  Packwood
testified J. R. functioned at a borderline intellectual level, had some
problems understanding simple things, and would have difficulty learning in
school as he got older.  Similarly, Carol
Giardina, a therapist who treated J. R., testified J. R. would require a lot of
tutoring or individual attention in school to help him with his reading and
learning difficulties. 

Packwood testified J. R. needed a
home that was extremely structured, even to the point of being told when to go
to the bathroom.  He said it was important
for J. R. to start feeling in control of his life, and J. R. needed Aconcreteness.@ 
Dr. Williams testified to the importance of a routine for a child who
suffers from enuresis and encopresis, and stated J. R. had that routine with
the Rogers.  

Thomas testified H. R. could not meet
J. R.=s academic, social, or emotional needs at the present
time.  Thomas did not believe it was
appropriate for J. R. to be returned to H. R. because, given J. R.=s needs and issues, she was not capable of parenting him and
had not gained the necessary skills to care for a child.  Marshall also testified that H. R. was unable
to parent J. R. at the present time and that J. R. should remain with his
foster parents. 

(iii)     The plans for the child by the parent or
agency seeking custody

H. R. argues that, while CPS plans to
seek adoptive parents for J. R., his foster family has not committed to adopt
him and there are no other immediate plans for J. R.=s adoption.  H. R. contends that it is in the best
interest of a child to have continuity of care and caretakers, as well as
timely integration into a stable and permanent home, which cannot occur in the
absence of an adoptive commitment.  








In support of this argument, H. R.
cites In re C.H, 25 S.W.3d 38 (Tex. App.CEl Paso 2000), rev=d, In re C.H., ___ S.W.3d ___, (Tex. 2002).  In that case, the court of appeals reversed a
trial court=s judgment terminating parental
rights because it found the evidence was not factually sufficient to show that
termination was in child=s best interest when there was no evidence that the foster
parents intended to adopt the child and there was Ano testimony about the child=s need for continuity of care and
caretakers and for timely integration into a stable and permanent home.@ 
Id. at 54.  However, on review, the Texas Supreme Court
admonished the court of appeals not to give inordinate weight to the lack of
evidence regarding adoptive placement plans for the child and not to discount
other evidence of a parent=s
historical deficiencies in parenting and his current criminal
proclivities.  In re
C.H., ___ S.W.3d at ___.  The
Court instructed us as follows:

Evidence about placement plans and adoption are, of
course, relevant to best interest.  However,
the lack of evidence about definitive plans for permanent placement and
adoption cannot be the dispositive factor; otherwise, determinations regarding
best interest would regularly be subject to reversal on the sole ground that an
adoptive family has yet to be located. 
Instead, the inquiry is whether, on the entire record, a factfinder
could reasonably form a firm conviction or belief that termination of the
parent=s rights would be in the child=s best interest_even if the agency is unable to identify with
precision the child=s future home environment.

Id. at ___.  The Court reversed
the court of appeals= judgment and remanded the case to consider the appellant=s factual sufficiency point under the
Court=s newly announced standard of
review.  Id.  

Here, Kenneth Rogers, J. R.=s foster father, testified he had made no commitment to CPS
to adopt J. R.  However, he testified
that he was committed to being a foster parent forever and that J. R. was in
his plans.  There was no evidence that
the Rogers intended to cease being foster parents to J. R, and it was
undisputed that the Rogers were good foster parents and that J. R.=s health and well-being had improved while in their care.








H. R. points to the testimony of one
of J. R.=s caseworkers, Terri Martin, who
testified that foster care was Anot fair@ because it was not a permanent home, and if the current
foster family decided in the future to stop caring for foster children, the
child would have to be moved to other homes. 
However, as discussed above, Martin testified that H. R.=s rights should be terminated because she could not provide
for J. R.  Additionally, Martin testified
that J. R. should never be returned to H. R., and the best place for him was to
continue in foster care with the Rogers while an adoptive placement is
sought.  She said J. R. was Adoing great@ with the Rogers and was happy
there.   

In contrast, H. R. offered no plan to
provide for J. R.=s needs other than to Atake it day by day@ and to give him love and Aeverything.@ 
She testified that because she was in a Astable condition@ and had a place to live with her
fiancé, Jose Ramirez, who worked for Dow, she thought she and J. R. could Asurvive.@ 
If H. R. violated her probation and was sent to jail, she testified that
she would place J. R. with her father. 
However, she admitted that her father had molested her when she was a
child, and agreed he would not be a good placement for J. R.

(iv)      The stability of the home or the
proposed placement

Thomas, J. R.=s most recent caseworker, testified
that J. R.=s foster family were Aawesome@ parents to J. R, and they were his
family.  He agreed the foster parents
were meeting J. R.=s emotional, academic, and social
needs.  The foster parents told Thomas,
and Kenneth Rogers testified, that J. R. did not ask to speak to or see his
mother.  The jury heard evidence that the
Rogers worked with J. R. to teach him life skills and assist him with his reading
abilities, and he was making progress in all areas.  Kenneth Rogers testified that, while they had
no plan to adopt J. R., he was welcome in their home indefinitely. 








(v)       Acts or omissions of the parent that may indicate the existing
parent-child relationship is not a proper one

There was evidence from which the
jury could determine that H. R. put herself before her child.  While J. R. was in her care, she used crack
cocaine and alcohol, which she admitted endangered her child.  She would drink in front of J. R. and lose
consciousness, essentially leaving him alone. 
On one occasion, she became unconscious or fell asleep in a hospital
because she was intoxicated while J. R. sat by, crying and begging his mother
to wake up.  She drove while she was
intoxicated with J. R. in the car.  She
also smoked cigarettes around J. R., whom she believed to have asthma, even
though she knew it could harm him, and the only medication she had for him had
long passed its expiration date. 
Packwood, the clinical social worker, testified that H. R. emotionally
abused J. R., and that J. R. had not overcome this abuse.

Additionally, H. R. had been
convicted of several misdemeanors and felonies for which she was on
probation.  She admitted that as a result
of her criminal history she had endangered J. R. by going in and out of
jail.  She also admitted that if she is
again found with drugs or alcohol in her system or otherwise violates her
probation, she will return to jail.  

The evidence showed that H. R. had
tried several substance abuse treatment programs in unsuccessful attempts to
stop drinking and taking drugs, but it was only after she was faced with the
possibility of jail time that she was able to succeed.  Several witnesses testified that she was at
high risk for relapsing into alcohol and drug abuse.

Additionally, the jury heard evidence
that H. R. emotionally abused J. R., and that he had not overcome this
abuse.  Several witnesses testified that
H. R. was unable to parent J. R. and may never be able to do so.  While in foster care, J. R. did not ask to
contact his mother, and he regressed after visits with H. R.








b.         H.
R.=s Arguments on Appeal

H. R. argues that the evidence is
insufficient to show that termination was in J. R.=s best interest because (1) the
evidence showed H. R. no longer engaged in substance abuse and was continuing
with counseling and treatment programs; (2) there was no evidence she lacked a
safe and stable home environment; (3) her rights should not be terminated
merely because she has a low I.Q. and the foster family may be able to provide
a better environment educationally; (4) there is no evidence of an immediate
adoptive placement for J. R. either by the foster family or another person; (5)
the testimony of J. R.=s guardian ad litem, Kimber Marshall, is not credible
compared to that of the caseworker, Tyrone Thomas; and (6) the sexual abuse
allegation and J. R.=s enuresis and encopresis should not be used against
her.  While we agree with some of these
arguments, we find that the evidence as a whole supports the finding that
termination was in J. R.=s best interest.








First, while we laud H. R. for
completing the Door to Recovery program and her commitment to remain drug and
alcohol free, there was substantial evidence that she had a long history of
alcohol and drug abuse, had been in and out of treatment programs, and was at a
high risk for relapse.  There was also
evidence that she did not take the recommended post-treatment counseling and
support groups seriously.  She was not
attending all the programs as recommended, and several witnesses testified that
her failure to do so would greatly increase her risk for relapse.  She admitted that if she relapsed, it would
endanger J. R.  And, although H. R.
testified that her motivation to quit her substance abuse was the desire to get
her son back, the jury could have reasonably determined from the evidence that
her primary motivation was, in fact, the desire to remain out of jail.  Viewing the totality of the evidence, the
jury could have reasonably concluded that H. R.=s actions that endangered J. R. in
the past could re-occur in the future.  See
In re D.L.N., 958 S.W.2d at 941; see also Hann
v. Texas Dept. of Protective and Regulatory Servs.,
969 S.W.2d 77, 84 (Tex. App.CEl Paso 1998, pet. denied) (holding that sufficient evidence
supported termination despite considerable evidence that mother made
significant improvements with regard to drug use and parenting skills).

Moreover, H. R. demonstrated an
inability to be truthful both on the witness stand and in her dealings with
others.  For example, at trial, H. R.
admitted drinking on the day of the PPT meeting, but denied ever smoking
marijuana.  Her testimony was
contradicted by the CPS caseworker who attended the PPT meeting with H. R., who
testified she admitted to him she had had Aa couple of beers and some marijuana@ before the meeting.  H. R.=s testimony was also belied by
evidence of urinalysis test results at the Gulf Coast Center that were positive
for marijuana.  On a number of occasions,
H. R. attempted to justify her positive urinalyses to her counselors with
untruthful or far-fetched excuses.  Once
she said had used drugs because she was upset that J. R. had received burns
while in foster care, which did not happen. 
Another time she said her friends had kidnapped her, tied her up, and
forcibly Ashot her up@ with drugs.  H. R. maintained at trial that this incident
did happen, but when asked who the friends were, she at first stated she could
not remember their names, and then testified all she knew was that it was
someone named AMary@ and her boyfriend.  Given this evidence, a jury could reasonably
question H. R.=s credibility.

Second, H. R. contends that CPS
presented no testimony regarding H. R.=s current home environment and
whether it would be a safe and stable environment for J. R.  However, H. R. does not point us to any
evidence that her home is in fact safe and stable.  She testified that she was in a Astable condition@ living with a man, whom she
described as her fiancé, who had a job. 
However, she moved in with him on the day she met him, and her history
shows that she has lived with two other men since J. R.=s father died, one of whom had been
convicted of public intoxication.  H. R.
also had no specific plans for dealing with J. R.=s emotional, physical, and
educational needs.  Several witnesses
testified H. R. was not capable of parenting her son, and questioned her
ability to make good choices for him.  Therefore,
we do not find the lack of specific information about her current home
environment persuasive.








Third, while a parent=s low I.Q., without more, is not a
sufficient basis upon which to terminate the parent-child relationship in a
given circumstance, it is a factor we may take into account, particularly when
it leads the parent to make bad choices regarding her child.  It is evident that H. R. has a history of
making bad choices by using drugs and alcohol, smoking around J. R. even though
she believed he was asthmatic, keeping him out of school when she admitted she
was not qualified to teach him, and committing crimes that resulted in jail or
probation while J. R. was in foster care. 
Additionally, there was evidence that she did not teach J. R. the basic
life skills that were necessary for his future development.  She was also unable to successfully
toilet-train her son.  Given this and the
other evidence discussed, it cannot be said that H. R.=s parental rights were terminated
solely because she had a low I.Q. and the foster parents could provide a better
education for J. R.

Fourth, H. R. emphasizes that the
Rogers, the foster parents, have made no commitment to adopt J. R., and the
possibility of continuing foster care, possibly in different homes, could be
detrimental to him.  However, Kenneth
Rogers testified he had made a commitment to J. R. and he intended to continue
as a foster parent indefinitely.  It is
undisputed that J. R. has a good home with the Rogers, is healthier, and has
made significant progress in their care. 
In light of the Supreme Court=s admonition in In
re C. H. that we are not to put undue weight on the lack of evidence of an
adoptive placement while disregarding other significant evidence that
termination is in the best interest of the child, we decline to accept H. R.=s invitation to reverse this case on the ground that there is
no immediate plan for him to be adopted. 
See In re C.H., ___ S.W.3d at ___.








Fifth, H. R. asserts that the
testimony of Marshall, J. R.=s guardian ad litem, should be
discounted and that of Thomas, the caseworker, should be accepted.  H. R. contends Marshall was not credible
because her testimony was based on only three or four visits with J. R. and H.
R., and was not based on personal knowledge or her own investigation.  H. R. criticized Marshall=s characterization of H. R.=s interaction with J. R. as one lacking the level of
affection that Marshall believed she would display in that situation.  H. R. points to Marshall=s testimony that Marshall had no
personal knowledge of the conditions at the foster home and had no personal
knowledge whether J. R. could brush his teeth or tie his shoes.  H. R. also contends Marshall did not take into
consideration or testify regarding H. R.=s progress since entering the Door to
Recovery program.  In contrast, H. R.
emphasizes the testimony of Tyrone Thomas, who believed that having CPS as a
permanent managing conservator was an appropriate alternative to termination in
this case. 

As an initial matter, we note that
the jury heard Marshall=s testimony regarding the basis for
her opinions and the other matters H. R. complains of, and they were free to
weigh this evidence against the testimony of the other witnesses in determining
her credibility.  We also note that,
regarding Marshall=s testimony that she thought there was
less-than-normal affection between H. R. and J. R., Packwood also testified
that H. R. was loving toward J. R., but J. R. did not reciprocate.  Marshall also testified that H. R. and J. R.
were Aplaymates@ that did not talk much, which is
consistent with Thomas=s observations.  And,
as discussed above, even Thomas testified that J. R. should not be returned to
H. R. at the present time because she lacked the skills to parent him.  

Sixth, H. R. contends the sexual
abuse allegation and J. R.=s enuresis and encopresis should not
be held against her.  We agree with the
former but not the latter.  We have
already determined that the evidence was insufficient to support a finding that
H. R. knowingly left J. R. with a man who may have abused him.  For the same reasons, we find the evidence of
alleged sexual abuse in this case inconclusive for purposes of considering the
best interest of the child.  However,
with regard to J. R.=s enuresis and encopresis, we find
that H. R.=s testimony regarding her
unsuccessful attempts to toilet-train J. R., the lack of any evidence that the
cause is medical, and the testimony that the problems were psychological in
nature, were properly considered by the jury when determining H. R.=s ability to parent and the best
interest of the child.  However, even if
we were to disregard the evidence relating to J. R.=s enuresis and encopresis, there
would still be more than sufficient evidence to support the jury=s finding.








While there is no question that H. R.
loves her son and has made progress in her efforts to remain drug and alcohol
free, the evidence is sufficient to enable a reasonable jury to form a firm
conviction or belief that termination would be in J. R.=s best interest.

Accordingly, we affirm the judgment
of the trial court.

 

 

/s/        Michol O=Connor

Justice

 

 

 

 

Judgment
rendered and Opinion filed October 17, 2002.

Panel
consists of Chief Justice Brister and Justices Hudson and O=Connor.*

Do
Not Publish C Tex.
R. App. P. 47.3(b).

 

 

 

 

 

 

 

 

 

 

 

 

* The Honorable
Michol O=Connor, Retired Justice, Court of Appeals, First
District of Texas at Houston, participating by assignment.

 











[1]  There had
previously been referrals in January and February of 2000. 





[2]  The CPS
caseworker testified at trial that H. R. suggested Oscar Valdez as a possible
placement for J. R.  However, H. R.
testified that she gave the caseworker the name of Eloy Torres, not Oscar
Valdez, and that it must have been Torres, not Valdez, that was found to be
intoxicated.





[3]  At trial, H.
R. admitted drinking beer before the meeting; however, she denied ever smoking
marijuana or telling the CPS caseworker that she did. 





[4]  H. R. admitted
to convictions for theft in June of 2000, theft by check in August of 2000,
possession of a controlled substance on April of 2000, two forgeries in April
of 2001, and burglary of a building in April of 2001. 





[5]  J. R. stated
that “Oscar” had Adone something@ to him.





[6]  H. R.
testified that she suggested that Eloy Torres, not Oscar Valdez, could take J.
R., but even if it was Torres, not Valdez, that was found to be intoxicated,
that individual was found not to be an appropriate placement for J. R.





[7]  At trial, H.
R. testified that J. R.=s
enuresis and encopresis had always been a problem for him, and that she had
taken him to physicians several times for evaluation.  Carol Giardina, a therapist who works with
abused children, testified that J. R. told her that his enuresis and encopresis
began when Oscar began coming around, but H. R. had told her the problems began
after J. R.’s father died.





[8]  H. R. argues
that J. R.=s improvement with his enuresis and encopresis
coincided with her consistent visitations with him after she entered the Door
to Recovery program, but she presented no evidence or testimony that her visits
positively impacted J. R.=s toilet-training. 
Additionally, there was testimony that J. R. regressed after visits with
H. R.





[9]  At the time of
trial, H. R. testified that she have been living with Jose Ramirez, her fiancé,
for about fifteen months.